1  Tina Wolfson (SBN 174806)
   Robert Ahdoot (SBN 172098)
2  Bradley K. King (SBN 274399)
   **AHDOOT & WOLFSON, PC**
3  2600 West Olive Avenue, Suite 500
   Burbank, California 91505
4  Tel: (310) 474-9111
   Fax: (310) 474-8585
5  twolfson@ahdootwolfson.com
   rahdoot@ahdootwolfson.com
6  bking@ahdootwolfson.com
7
8  **LIDDLE & DUBIN, P.C**.
   Nicholas A. Coulson (PHV forthcoming)
9  Matthew Z. Robb (PHV forthcoming)
   975 E. Jefferson Ave.
10 Detroit, Michigan 48207
   Tel: 313-392-0015
11 Fax: 313-392-0025
12 ncoulson@ldclassaction.com
   mrobb@ldclassaction.com
13

*Attorneys for Plaintiff and the Putative Class*

14

15          **IN THE UNITED STATES DISTRICT COURT**
16          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

17  JI KWON, individually and on behalf of all      )    Case No. 3:20-cv-9328-YGR
    others similarly situated,                      )
18                                                  )
                                                    )    **FIRST AMENDED CLASS ACTION**
19                     Plaintiff,                   )    **COMPLAINT**
                                                    )
20            v.                                    )    JURY TRIAL DEMANDED
                                                    )
21  ROBINHOOD FINANCIAL LLC, a Delaware             )
    LLC, and ROBINHOOD SECURITIES, LLC, a           )
22  Delaware LLC,                                   )
                                                    )
23                     Defendants.                  )
                                                    )
24                                                  )

25

26

27

28

## INTRODUCTION

1. Plaintiff Ji Kwon ("Plaintiff"), by and through his counsel, files this Class Action Complaint against Robinhood Financial LLC ("Robinhood Financial") and Robinhood Securities, LLC ("Robinhood Securities") (collectively, "Defendants" or "Robinhood") on behalf of himself and on behalf of a class of similarly situated individuals, and alleges, upon personal knowledge as to his own actions, and upon investigation of counsel as to all other matters, as follows:

## NATURE OF THE ACTION

2. Robinhood, a multi-billion dollar mobile application and website investment service, has capitalized on a surge of first-time market investors by misleading and luring unsuspecting consumers to execute inferior market trades on the platform under the guise of "commission free" trading.

3. Through a process of deceit and omission, Defendants misled consumers and failed to disclose that Robinhood's business operations relied extensively upon "payment for order flow," in which Defendants received payment from market makers in exchange for executing the service's trades.

4. These payments often came at the expense of the consumer. While Defendants promoted and advertised an easy-to-use "commission free" trading platform, Defendants profited extensively from unsuspecting consumers who executed trades on Defendants' platform at inferior execution prices compared to what consumers would have received from Robinhood's competitors. For larger value orders, this price differential often exceeded the commission its competitors would have charged. These inferior prices were caused in large part by the unusually high charges Robinhood required from principal trading firms for the opportunity to obtain Robinhood's customer order flow.

5. The principal trading firms/electronic market makers in turn passed these costs along to Robinhood's clients on each trade through inferior execution quality—the price at which the requested market orders were executed.

6. Effectively, Robinhood charged backdoor commission fees to each of its clients' orders, while concealing and denying the payment for order flow scheme.

7. To effectuate this scheme, Defendants published misleading statements and omissions in customer communications relating to the execution of trades and Robinhood's revenue sources. For years, Robinhood's retail communications to consumers omitted receipt of payment for order flow, even

though it was Robinhood's single largest source of revenue.

8.      Robinhood failed to disclose and omitted information regarding this process in numerous ways, including instructing customer service representatives not to mention payment for order flow in response to questions about Robinhood's sources of revenue and omitting it from its website's FAQ section.

9.      As a broker-dealer that routed customer orders for execution, Robinhood had a duty of best execution to its clients, a duty to seek and obtain the best reasonably available terms for customers' orders. Robinhood knowingly violated its duty of best execution by charging unusually high payment for order flow rates to its vendors and failing to conduct adequate regular and rigorous reviews of the execution quality it was providing on customer orders.

10.     Plaintiff brings this action on behalf of himself and a class of similarly situated individuals who were victims of Defendants' materially deceptive acts and omissions, relying upon Robinhood's warranties, advertisements, and representations, as well as Robinhood's duty of best execution in executing trades on consumer's behalf.

11.     Defendants have quietly sought to force its customers to execute trades on Defendants' platform at inferior prices compared to what consumers would have received from Robinhood's competitors, while profiting on the back end of those trades.

12.     Defendants uniform conduct is equally applicable to the class. Plaintiff brings this class action against Defendants for: (1) Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5; (2) Violations of California Consumers Legal Remedies Act ("CLRA"), Civil Code § 1750, et seq.; (3) Violations of California Unfair Competition Law ("UCL"), Bus. & Prof. Code § 17200, et seq.; (4) Violations of California False Advertising Law ("FAL"), Bus. & Prof. Code § 17500, et seq.; (5) Negligent Misrepresentation; (6) Breach of Implied Covenant of Good Faith and Fair Dealing; and (7) Breach of Fiduciary Duty.

13.     Plaintiff seeks an order for relief including but not limited to the following: (1) requiring Defendants to pay damages and restitution to Plaintiff and the Class; and (2) enjoining Defendants from further legal violations through Robinhood's payment for order flow collection scheme and requiring Defendants to publicly correct the false and misleading statements and omissions alleged herein.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* This Court also has Class Action Fairness Act (CAFA) jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(a). CAFA jurisdiction is appropriate as this action's amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from Defendants.

15.     This Court has personal jurisdiction over Defendants because Defendants are citizens of California, conduct significant, substantial, and not-isolated business activities in California and a substantial portion of the acts complained of took place in California.

16.     Venue is proper in the Northern District of California because Defendants conduct business in this District and many of the events that gave rise to Plaintiff's claims occurred in this District.

## PARTIES

17.     Plaintiff Ji Kwon is an individual and citizen of California for jurisdictional purposes.

18.     Defendant Robinhood Financial LLC is a Delaware LLC with its principal place of business located at 85 Willow Road, City of Menlo Park, County of San Mateo, State of California.

19.      Defendant Robinhood Securities, LLC is a Delaware LLC with its principal place of business located at 85 Willow Road, City of Menlo Park, County of San Mateo, State of California.

## FACTUAL ALLEGATIONS

**A.     Background**

20.     Robinhood offers self-directed securities brokerage services to customers by means of its website and smartphone applications. Robinhood is a Commission-registered broker-dealer and a member of Financial Industry Regulatory Authority ("FINRA"). Robinhood Financial acts as an introducing broker and has a clearing arrangement with Robinhood Securities. When customers open accounts with Robinhood, they enter into a customer agreement with Robinhood Financial and Robinhood Securities.

21.     Robinhood was founded in 2013 and began offering retail brokerage accounts to the general public in March 2015. Robinhood distinguished itself from other retail-oriented broker-dealers

3

by, among other things, allowing customers to place orders to buy and sell securities without paying a trading commission. It was this price-value proposition that allowed Robinhood to rapidly grow.

22. By June 2019, Robinhood had 9 million approved customer accounts.

**B. Principal Trading Firms and Payment for Order Flow**

23. Rather than sending customer orders to buy or sell equity securities directly to national exchanges, Robinhood, like other retail broker-dealers, routed its orders to other broker-dealers (often referred to as "principal trading firms" or "electronic market makers") to either execute those orders or route them to other market centers.

24. Principal trading firms attempt to profit from executing large volumes of retail buy and sell orders either by taking the other side of customer orders and exiting the positions at a profit, which is also known as "internalization," or by routing the orders to other market centers.

25. Historically, market makers paid fees to regional intermediaries for their services in executing trades with other local firms on behalf of the market maker. In order to grow a guaranteed supply of liquidity in their markets, market makers began offering payments to not only the intermediaries, but also retail firms, including brokers, in exchange for the retail firms routing their orders to the market makers. This practice, which expanded from off-exchange securities (over-the-counter or "OTC" securities) to exchange-traded securities, came to be known as "payment for order flow." Over time, different types of venues, including Electronic Communication Networks ("ECNs") and exchanges, also began making payments for order flow.

26. Principal trading firms offer incentives to retail broker-dealers to send them order flow. One such incentive is "payment for order flow," which is defined in Rule 10b-10(d)(8) of the Exchange Act to include any monetary payment, service, property, or other benefit that results in remuneration, compensation, or consideration to a broker-dealer in return for the routing of customer orders.

27. Since it began operating as a broker-dealer, Robinhood, like other retail broker-dealers, has received payment for order flow in exchange for routing its customer orders to principal trading firms.

28. SEC rules permit the receipt of payment for order flow by broker-dealers as long as it does not interfere with their efforts to obtain best execution, and as long as the routing of that order flow,

as well as a description of all terms of any such arrangements that may influence the broker-dealer's order routing decision, are disclosed in quarterly reports filed pursuant to 17 CFR § 242.606 (Disclosure of order routing information, "SEC Rule 606").

29. Another incentive that principal trading firms may provide to retail broker-dealers is "price improvement" on customer executions. Price improvement occurs when a customer order receives an execution at a price that is superior to the best available quotation then appearing on the public quotation feed, that is, by executing a "buy" order at a price lower than the lowest prevailing offer or executing a "sell" order at a price higher than the highest prevailing bid.

30. Price improvement creates a direct financial benefit for the customer, since the customer receives a better price than he or she would have received had the order been executed at the national best bid and offer ("NBBO") on the public quotation feed.

31. In practice, most retail broker-dealers obtain price improvement on the vast majority of customer orders that they send to principal trading firms.

**C.    The Duty of Best Execution**

32. Broker-dealers such as Robinhood owe their customers a duty of "best execution." Best execution requires that a broker-dealer endeavor to execute customer orders on the most favorable terms reasonably available in the market under the circumstances. This includes taking into account price, order size, trading characteristics of the security, as well as the potential for price improvement and other factors. *See Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 135 F.3d 266, 270 & n.2 (3d Cir. 1998); *Marc N. Geman*, Securities Exchange Act Release No. 43963 (Feb. 14, 2001) (Commission opinion).

33. Although a broker-dealer is not required to examine every customer order individually for compliance with its duty of best execution, it must undertake regular and rigorous reviews of the quality of its customer order executions. *See Payment for Order Flow*, Securities and Exchange Commission Final Rule Release, Exchange Act Release No. 34902, 59 Fed. Reg. 55006, at 55009 (Oct. 27, 1994) (*"Payment for Order Flow Release"*).

34. The duty of best execution derives from, among other sources, the common law agency duty of loyalty, which obligates an agent to act exclusively in the principal's best interest. Payment for order flow has the potential to create a conflict of interest between the broker-dealer and its customer

because payment for order flow is a benefit that goes to the broker-dealer itself, whereas other incentives that may be obtained for routing order flow, such as price improvement, benefit the broker-dealer's customers. A broker-dealer must not allow payment for order flow to interfere with its efforts to obtain best execution. *See Payment for Order Flow Release*, at 55009 & n.28.

35.     In the context of transacting in securities, best execution requires that, when conducting a transaction on behalf of a client, a broker seek the terms most favorable to the client that can possibly be obtained given the present circumstances.

36.     When securities are traded in different venues, best execution requires that, absent instruction otherwise from the client, a broker-dealer ensure that the client's order be routed to the best possible venue. A broker achieves best execution when it endeavors to obtain the best price available, execute the transaction in the shortest possible time frame, maximize the likelihood that the transaction is executed in its entirety, and, where possible, seek "price improvement"—the execution of a trade at a price better than the best current public quote.

37.     NASD Rule 2320 provided that Robinhood, as a broker-dealer, would "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."

38.     The factors to be considered in determining reasonable diligence were "(A) the character of the market for the security, e.g., price, volatility, relative liquidity, and pressure on available communications; (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to" Robinhood.

39.     Financial Industry Regulatory Authority ("FINRA") Rule 5310, which superseded NASD Rule 2320 on May 31, 2012, incorporates all of that Rule's provisions concerning a broker-dealer's duty of best execution.

**D.     Robinhood's Initial Public Messaging Concerning Payment for Order Flow**

40.     In 2014, prior to its public launch, Robinhood published an FAQ page on its website providing information about the company and its anticipated brokerage operations. The first version of the FAQ disclosed that Robinhood anticipated receiving payment for order flow in its answer to the

question "How does Robinhood make money?"

41.     Also in 2014, a best-selling author published a book that chronicled various aspects of the electronic securities trading industry and portrayed payment for order flow as a controversial practice.[1]

42.     Several news organizations also published articles discussing payment for order flow and other issues concerning electronic trading venues.[2]

43.     Senior Robinhood personnel were aware of these publications and the ensuing controversy regarding payment for order flow and its association with principal trading firms (which were also sometimes referred to as "high frequency trading firms"). They became concerned that if the public associated Robinhood with payment for order flow and high frequency trading firms, it could be viewed as controversial by Robinhood's customers.

44.     In light of these concerns, in December 2014, Robinhood removed the reference to payment for order flow from its answer to the "How does Robinhood make money" FAQ and created a new FAQ page that specifically discussed payment for order flow.

45.     This new FAQ page stated that the payment for order flow revenue Robinhood received at the time was "indirect" and "negligible." It also stated that if payment for order flow ever became a direct or significant source of revenue, Robinhood would inform customers of those facts on the "How does Robinhood make money" FAQ page.

46.     In the first quarter of 2015, Robinhood launched its trading platform to the public. Although the company's overall revenue was modest in 2015 through mid-2016, during that time payment for order flow comprised more than 80% of the company's revenue.

47.     These payments received for order flow were directly related to client orders and constituted a significant amount of the company's revenue. Yet, Robinhood concealed these facts from its clients.

---

[1] https://www.pbs.org/newshour/show/flash-boys-investigates-high-frequency-traders-anticipate-wall-streets-next-move-faster (last visited December 21, 2020).

[2] https://www.ft.com/content/97810c5e-fd1c-11e3-8ca9-00144feab7de (last visited December 21, 2020).

### E. Robinhood Received Unusually High Payment for Order Flow Rates and Failed to Conduct Rigorous Reviews of its Execution Quality

48. Initially, Robinhood relied on another broker-dealer to provide both clearing and order execution services for Robinhood customer orders. That broker-dealer routed Robinhood customer orders to principal trading firms, received payment for order flow in return, and shared a portion of that payment for order flow with Robinhood.

49. During the first half of 2016, Robinhood decided to start routing customer orders directly to principal trading firms and cease relying on the other broker-dealer for order execution routing services. By doing so, Robinhood could earn additional payment for order flow revenue.

50. In or around May 2016, Robinhood began negotiations with a number of principal trading firms about potentially routing Robinhood customer orders to those entities.

51. During those negotiations, certain principal trading firms told Robinhood that there was a trade-off between payment for order flow on the one hand and price improvement on the other: If Robinhood negotiated for higher payment for order flow revenue, according to the principal trading firms, there would be less money available for the principal trading firms to provide price improvement to Robinhood's customers.

52. At least one principal trading firm communicated to Robinhood that large retail broker-dealers that receive payment for order flow typically receive four times as much price improvement for customers as they do payment for order flow for themselves—an 80/20 split of the value between price improvement and payment for order flow.

53. Robinhood negotiated a payment for order flow rate that was substantially and unusually higher than the rate the principal trading firms paid to other retail broker-dealers—which resulted in approximately a 20/80 split of the value between price improvement and payment for order flow.

54. Robinhood explicitly agreed to accept less price improvement for its customers than what the principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself. However, Robinhood did not disclose this fact to its clients.

55. In September 2016, Robinhood began routing customer orders directly and solely to principal trading firms. Around the same time, Robinhood formed a "Best Execution Committee" to

monitor the speed and the prices at which the principal trading firms were executing Robinhood customer orders. The Committee met at least once per month and included Robinhood's General Counsel. From October 2016 through at least June 2019, the Committee observed that Robinhood was not obtaining much price improvement on its customer orders in equity securities, particularly on orders of 100 shares or more.

56.     Meanwhile, in 2017, Robinhood developed a proprietary routing algorithm, known as a smart order router, designed to make the principal trading firms with which Robinhood had payment for order flow arrangements compete for order flow by routing customer orders to the principal trading firm that had provided the most price improvement for that stock over the prior 30 days. However, the smart order router did not address Robinhood's high payment for order flow rates or any potential execution prices that may be available at venues that did not agree to pay those rates. Even with its "smart" order router, Robinhood customer orders received poor execution quality.

57.     Although Robinhood was on notice that its high payment for order flow rates could lead to less price improvement, the Best Execution Committee did not conduct adequate, regular, and rigorous reviews to ensure that Robinhood was satisfying its best execution obligations.

58.     The Committee took no steps to determine whether Robinhood's payment for order flow rates were having a negative impact on the execution prices that Robinhood's customers received. Until October 2018, the Committee did not consider how Robinhood's price improvement statistics compared to those of other retail broker-dealers, or to the retail order execution market generally.

59.     In mid-2017, when one of the principal trading firms to which Robinhood routed order flow told Robinhood it would no longer agree to pay Robinhood's unusually high payment for order flow rates, but would pay a lower payment for order flow rate, Robinhood stopped routing customer orders to that principal trading firm.

60.     When certain Robinhood personnel began comparing the firm's order execution quality to competitors in October 2018, they learned that for most execution quality metrics, including the percentage of orders receiving price improvement, Robinhood's execution quality was worse.

61.     By March 2019, Robinhood had conducted a more extensive internal analysis, which showed that its execution quality and price improvement metrics were substantially worse than other

9

retail broker-dealers in many respects, including the percentage of orders that received price improvement and the amount of price improvement, measured on a per order, per share, and per dollar traded basis. Senior Robinhood personnel were aware of this analysis.

62. However, Robinhood's Best Execution Committee did not take appropriate steps to assess whether, in light of this information, Robinhood was complying with its duty to seek best execution of customer orders. Robinhood's failure from October 2016 through June 2019 to conduct adequate regular and rigorous reviews that involved benchmarking its execution quality against competitor broker-dealers to determine whether it was obtaining the best terms reasonably available for customer orders, violated the firm's duty of best execution.

## F. Robinhood Misleadingly Omitted Payment for Order Flow From Descriptions of Its Revenue Sources

63. By the end of 2016, Robinhood was generating a significant amount of revenue, the majority of which its controlling officers knew continued to come from payment for order flow. However, contrary to what the company had said in the payment for order flow FAQ, Robinhood did *not* disclose the new payment for order flow arrangements in its answer to the "How Robinhood Makes Money" FAQ on its website. Instead, at some point during 2016, Robinhood deleted the payment for order flow FAQ altogether.

64. Robinhood kept no records showing when the payment for order flow FAQ was deleted, why it was deleted, or who was responsible for approving its removal.

65. Between late 2016 and September 2018, Robinhood continued to grow rapidly. Although payment for order flow remained the company's largest revenue source throughout this period, Robinhood did not include payment for order flow as a revenue source in its answer to the "How Robinhood Makes Money" FAQ on its website.

66. The company failed to update the FAQ to include payment for order flow despite the fact that, in 2016 and 2017, the company did update the FAQ to include two other, smaller revenue sources: subscription-based memberships and interest on securities lending. The version of the "How Robinhood Makes Money" FAQ page that was posted on Robinhood's website from approximately April 2017 through September 2018 stated:



### How Robinhood Makes Money

**Robinhood Support**
April 14, 2017 19:22

Follow

**How does Robinhood make money?**

With Robinhood Gold, you get up to 2x your buying power and access to after hours trading for as little as $10 per month. This is the only product Robinhood charges you for, and is completely optional. Trading is still commission free.

Additionally, Robinhood earns revenue by collecting interest on the cash and securities in Robinhood accounts, much like a bank collects interest on cash deposits.

67.     Robinhood kept incomplete records of its updates to the "How Robinhood Makes Money" FAQ page, including incomplete records of who was responsible for approving updates to that page.

68.     The "How Robinhood Makes Money" FAQ was featured in certain of Robinhood's customer communications. From at least February 22, 2016 to October 26, 2017 Robinhood displayed a link to the "How Robinhood Makes Money" FAQ on the home page of its website:



69.     Moreover, Robinhood instructed customer service representatives to direct customers to the "How Robinhood Makes Money" FAQ page or use the language of the misleading FAQ answer when responding to general questions about how Robinhood made money. Thus, in response to inquiries from its customers between 2015 and August 2018 about how Robinhood made money—approximately

11

150 inquiries in total—Robinhood's customer service representatives did not identify payment for order flow as one of the company's revenue sources.

70.     Training documents for customer service representatives in early 2018 explicitly instructed them to "avoid" talking about payment for order flow and stated that it was "incorrect" to identify payment for order flow in response to the question how Robinhood makes money.

71.     Throughout this period, Robinhood disclosed some information about its receipt of payment for order flow as required in SEC-mandated reports pursuant to Rule 606. The company included these reports on the "Disclosure Library" page on its website that included a number of other legally-mandated disclosures. However, the company did not feature the "Disclosure Library" or the reports contained in that library prominently in its communication strategy, like it did with the "How Robinhood Makes Money" FAQ page.

72.     Robinhood's customer agreements and trade confirmations stated only vaguely that Robinhood "may" receive payment for order flow.

**G.     Robinhood Falsely Claimed That Its Execution Quality Matches or Beats That of Its Competitors**

73.     In response to media reports in September and October 2018 about Robinhood's payment for order flow rates, Robinhood added payment for order flow to the list of revenue sources appearing on the "How Robinhood Makes Money" FAQ page.

74.     But on October 12, 2018, it also published a new FAQ page that discussed payment for order flow and Robinhood's order execution quality. The new FAQ page stated that Robinhood's "execution quality and speed matches or beats what's found at other major brokerages." It also cited one statistic related to execution speed and one statistic related to the percentage of orders for S&P 500 stocks executed within the NBBO.



**What is the execution quality for orders on Robinhood?**

Reg NMS ensures your order gets executed at the national best bid and offer, or better, at the time of execution. Our execution quality and speed matches or beats what's found at other major brokerages. Even when measured at the time of routing, our customers' orders get executed at the NBBO or better. By way of example, in August 2018, 99.12% of our customers' marketable orders were executed at the the national best bid and offer or better with an execution speed of 0.08 seconds from routing to execution (for S&P 500 stocks, during market hours).

75. However, the internal analyses referenced in the paragraphs above that Robinhood conducted in October 2018 and March 2019 showed that Robinhood's execution quality was worse than that of other large retail broker-dealers in many respects. In particular, in October 2018, when certain Robinhood employees began gathering data to compare Robinhood's execution quality metrics to those of its competitors, other Robinhood personnel remarked that most of Robinhood's metrics were worse and discussed the execution quality metrics with certain senior Robinhood personnel.

76. A more extensive analysis Robinhood conducted in March 2019 stated that "[n]o matter how we cut the data, our % orders receiving price improvement lags behind that of other retail brokerages by a wide margin."

77. Robinhood further found that the amount of price improvement obtained for Robinhood customers was far lower than at competing broker-dealers, measured on a per order, per share, and per dollar traded basis. Senior Robinhood personnel were aware of this analysis.

78. For most orders of more than 100 shares, the analysis concluded that Robinhood customers would be better off trading at another broker-dealer because the additional price improvement that such orders would receive at other broker-dealers would likely exceed the approximately $5 per-order commission costs that those broker-dealers were then charging.

79. The analysis further determined that the larger the order, the more significant the price improvement losses for Robinhood customers—for orders over 500 shares, the average Robinhood customer order lost over $15 in price improvement compared to Robinhood's competitors, with that comparative loss rising to more than $23 per order for orders over 2,000 shares.

80. Robinhood removed the claim about Robinhood's execution quality matching or beating that of other broker-dealers from its FAQ in June 2019, after staff from the Commission's Office of Compliance Inspections and Examinations raised concerns about that sentence.

81. Between October 2016 and June 2019, certain Robinhood orders lost a total of approximately $34.1 million in price improvement compared to the price improvement they would have received had they been placed at competing retail broker-dealers, even after netting the approximately $5 per-order commission costs those broker-dealers were charging at the time.

### H. Plaintiff's Use of Defendants' Services

82.     Plaintiff Ji Kwon was a user of Defendants' services from 2017 throughout the end of the Class Period midway through 2019.

83.     During the Class Period, Plaintiff made several thousands transactions through Defendants' platform, involving more than 257,000 shares and several million dollars.

84.     Plaintiff believed that his market orders would be executed by Defendants at the best available price, and he was unaware that Robinhood was receiving compensation directly related to his orders as payment for order flow.

85.     Plaintiff did not know that Robinhood's receipt of payment for order flow was causing him to receive such unfavorable market prices on his orders.

86.     Plaintiff purchased shares of U.S. based exchange-listed stocks in trades executed at purported market prices during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct and inferior execution quality.

87.     Robinhood, in its capacity as a broker, received payment for order flow from market-makers to which the company routed its client's orders.

88.     At all times relevant to this complaint, Robinhood was bound by a duty of best execution.

89.     Defendants have failed to provide best execution for their clients, causing them material harm in the form of economic loss due to their orders going unfilled, underfilled, filled at a suboptimal price, and/or filled in a manner which adversely affects the order's performance post-execution.

90.     By receiving higher payments for order flow than its competitors, Robinhood negatively impacted, among other things, its clients' order execution and chances for price improvement.

91.     Robinhood did not pass along the payment for order flow it received on market orders to the clients who placed the orders. Instead, the Company pocketed these payments for order flow for itself and failed to disclose to Plaintiff and the putative class that it received substantial payment for order flow, or that these payments had a direct, adverse impact on the prices its clients received on their orders.

92.     Defendants' promise to provide "commission free" trading at best execution of its clients' orders caused Plaintiff and the Class to do business with Defendants, even though they could have placed orders through broker-dealers offering similar digitized trading platforms.

93.     Plaintiff acted reasonably in relying on Defendants' promises to offer commission free trading at best execution compared to the offerings of Defendants' competitors.

94.     Defendants intended for Plaintiff and the Class to rely on those promises in order to induce potential clients to open accounts and begin making market trades on Robinhood's platform, instead of their competitors' platforms.

95.     Defendants, Defendants' agents, and Defendants' senior management knew that the "commission free" trading promise was misleading under the circumstances and that the company's substantial, required payment for order flow conditions placed on its principal trading firm vendors could, would, and did cause Defendants' clients to uniformly receive inferior execution quality on market orders.

96.     Plaintiff and the Class suffered economic damages because of Defendants' unfair, unlawful, deceptive and misleading material acts and omissions, and Defendants' scheme to charge backdoor commission fees without disclosing the impact of those fees on Plaintiff and the Class.

## CLASS ALLEGATIONS

97.     Plaintiff brings this class action under Rule 23 and seek certification of the claims and issues in this action pursuant to the applicable provisions of Rule 23.  The proposed class is defined as:

> **All persons in the United States or its Territories who were users of Robinhood between September 1, 2016 and June 30, 2019 and who placed orders in connection with which Defendants received payment for order flow (the "Class").**

Excluded from the Class are Defendants' officers, directors, and/or employees

98.     Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

99.     Numerosity.  Fed. R. Civ. P. 23(a)(1).  The members of the Class are so numerous that their individual joinder is impracticable. Defendants had some nine million user accounts in June of 2019. Plaintiff is informed and believes there are, at minimum, hundreds of thousands of Class Members who have been damaged by the Robinhood's conduct as alleged herein. The exact size of the proposed class and the identity of all class members can be readily ascertained from Defendants' records.

100. Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the class, which questions predominate over any questions affecting only individual class members. Common issues include:

A. Whether the statements made by Defendants as part of their promises to provide, and assertions that they do provide, best execution of their clients' orders, discussed herein are true, or are reasonably likely to deceive, given the omissions of material fact described above;

B. Whether the federal securities laws were violated by Defendants' acts as alleged herein;

C. Whether statements made by the Defendants' officers, directors, and employees to the investing public during the Class Period misrepresented material facts about the business, operations and management of Defendants;

D. Whether Defendants' conduct constitutes a breach of fiduciary duties and/or the duty of best execution;

E. The nature of the relief, including equitable relief, to which Plaintiff and the class are entitled.

101. Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Class he seeks to represent. Plaintiff and all Class members were subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff and members of the Class. By placing orders in connection with which Defendants received payment for order flow during the relevant time period, all members of the Class were subjected to the same wrongful conduct. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

102. Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Further, Plaintiff's counsel is competent and experienced in litigating class actions, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

103.     Superiority.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to any other available means for the fair and efficient adjudication of this controversy.  The claims of Plaintiff and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendants, and it would be impracticable for class members to seek redress individually.  Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments.  Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendants' misconduct.  Class certification is therefore appropriate under Rule 23(b)(3).

104.     Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

105.     Class certification is also appropriate under Rule 23(b)(2), as Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

## FIRST CAUSE OF ACTION

### Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

106.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

107.     This Count is based upon Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated thereunder by the SEC.

108.     Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Robinhood's routing of customer orders and any effect that Robinhood's routing procedures have, or are likely to have, on the execution quality of its clients' orders.

109.     Defendants further have a duty of best execution, by which Defendants, as a dealer-broker, are legally required to seek the best price reasonably available for their customers' orders.

110.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud, deceit, and/or manipulation upon Plaintiff and the Class,

uniformly denying its customers best execution.

111.     Defendants made numerous untrue statements of facts and omitted material facts necessary to make the statements made not misleading in light of the circumstances under which they were made.

112.     Defendants further employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities, including by routing orders only to third party trading firms that agreed to render Robinhood's demanded payment for order flow, despite this knowingly causing Defendants' clients to receive inferior execution rates.

113.     This scheme by Defendants, including the materially misleading statements and omissions thereunder, was intended to, and throughout the Class Period did: (i) deceive Defendants' clients, including Plaintiff and other Class Members; (ii) cause the Class members to engage in a broker-client relationship with Defendants, which they otherwise would not have done; (iii) cause Plaintiff and the Class to make orders which they otherwise would not have placed; and (iv) deprive Plaintiff and the Class of the best execution of their orders.

114.     Further, Defendants knew that by failing to provide its clients with the best execution of their orders, each Plaintiff and Class Member would, and did, incur economic harm arising from executing Plaintiff's trades at prices less favorable than the best price available, including the chance to obtain a better price than the NBBO.

115.     Pursuant to the above plan, scheme, and course of conduct, Defendants and their agents, including senior management, participated directly or indirectly in the preparation of public statements and reports, including statements made to Defendants' clients, governmental entities, security analysts, and the media, that were designed to convince the public and general, and Plaintiff and the Class in particular, that Defendants were providing commission-free trading at best execution price to their clients, when Robinhood and their agents knew that it was not.

116.     Such statements and omissions were materially false and misleading with regard to Defendants' order routing practices and the means by which the company was profiting from its clients through undisclosed, but systematic, payments for order flow.

117.     Defendants, Defendants' agents, and Defendants' senior management had actual

knowledge of the materially false and misleading statements and material omissions alleged herein. Or, in the alternative, Defendants, Defendants' agents, and Defendants' senior management acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available.

118. Defendants and Defendants' senior management had actual knowledge of, or recklessly disregarded, the plan and scheme by which the Robinhood routed orders for the purpose of extracting payment for order flow, despite this practice uniformly failing to satisfy Defendants' duty of best execution.

119. Defendants are liable both directly and indirectly for the wrongs alleged herein. Defendants and Defendants' senior managers were able to, and did, directly or indirectly control the content of the misleading public statements and omissions made by Robinhood.

120. As a result of Defendants' plan, scheme, conspiracy, and course of conduct, and the materially misleading statements and omissions made in furtherance thereof, Plaintiff and the Class placed orders through Robinhood with the reasonable expectation of receiving best execution throughout the Class Period.

121. Without knowledge that Defendants were knowingly failing to satisfy their duty of best execution, which was concealed and misrepresented by Defendants through numerous platforms, Plaintiff and the Class placed orders through Robinhood, in reasonable reliance on the materially false and misleading statements and omissions, causing economic injury and damages.

122. Defendants' plan, scheme, conspiracy, and course of conduct had a uniform effect on Plaintiff and the Class, in that the diversion of order flow to principal trading firms who agreed to satisfy Defendants' substantial demand for payment for order flow caused uniformly inferior execution quality compared to the prices available on the market through other firms.

123. Defendants' plan, scheme, conspiracy, and course of conduct constituted a fraud on the market, in that the price at which each stock is traded was presumably impacted by Defendants' fraudulent information, thus injuring every investor who trades in any particular security.

124. Through the conduct alleged herein, Defendants have, knowingly or recklessly, directly

or indirectly, violated Section 10(b) of the Security Exchange Act and Rule 10b-5 promulgated thereunder.

125. At the time Plaintiff and the Class made orders with Defendants for securities, better prices were available to Plaintiff and the Class on each order, but these prices were not provided by Defendants.

126. As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff and the Class have suffered economic damages in connection with Defendants' routing of their orders and failure to satisfy its duty of best execution during the Class Period.

## SECOND CAUSE OF ACTION

### Violations of CLRA – Civil Code § 1750, et seq.

127. Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

128. This cause of action is brought pursuant to the CLRA, California Civil Code § 1750, et seq., because Defendants' actions and conduct described herein constitute transactions that have resulted in the sale or lease of goods or services to consumers.

129. Plaintiff and each member of the Class are consumers as defined by California Civil Code §1761(d).

130. The securities at issue herein are Goods within the meaning of Civil Code §1761(a) and Defendants' services are Services within the meaning of Civil Code §1761(b).

131. In violation of Civil Code § 1770(a)(5), Defendants, by use of the untrue or misleading statements and/or omissions set forth and alleged in this complaint, represented that goods and/or services have characteristics or benefits which they do not have.

132. In violation of Civil Code § 1770(a)(7), Defendants, by use of the untrue or misleading statements and/or omissions set forth and alleged in this complaint, represented that the goods are of a particular standard, quality, or grade, when they were in fact below that standard, quality, and/or grade.

133. In violation of Cal. Civ. Code § 1770(a)(9), Defendants advertised their goods and/or services with the intent not to sell them as advertised (because it knew that their securities were sold at inferior execution quality than advertised).

134. In violation of Cal. Civ. Code § 1770(a)(13), Defendants made materially false or

misleading statements of fact and/or omissions concerning the reasons for, existence of, or amounts of price reductions.

135. In violation of Cal. Civ. Code § 1770(a)(14), Defendants represented that the security transactions involved rights, remedies, and/or obligations which it does not have or involve, or that are prohibited by law, as Defendants explicitly and/or implicitly represented that their securities were bought and sold on behalf of clients at best execution, while Defendants knew they were not.

136. In violation of Cal. Civ. Code § 1770(a)(16), Defendants represented that the subject of a transaction had been supplied in accordance with a previous representation (that securities would be bought and sold at best execution) when Defendants knew they were not.

137. Defendants knew, or should have known, that their representations and advertisements about the routing of their orders and the execution qualities of the security transactions made on behalf of clients were false or misleading.

138. On or about the date of filing this action, Plaintiff notified Defendants in writing, by certified mail, of the violations alleged herein and demanded that Defendants remedy those violations. Attached hereto is a declaration on behalf of Plaintiff pursuant to Cal. Civ. Code § 1780(d).

139. As a result of Defendants' unlawful conduct, Plaintiff and the Class suffered economic damages as stated herein, including through the loss of value in the securities ordered through Defendants' companies.

140. Plaintiff presently seeks only injunctive relief under this count. If Defendants fail to remedy the violations alleged herein within 30 days of receipt of Plaintiff's notice, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages pursuant to the CLRA.

141. Defendants' conduct is malicious, fraudulent, and wanton in that Defendants intentionally and knowingly provided misleading information to the public and refused to remedy the problem long after definitively learning that their product offerings were substandard.

### **THIRD CAUSE OF ACTION**

### **Violations of UCL, Bus. & Prof. Code § 17200, et seq.**

142. Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

143. Defendants' conduct constitutes unlawful, unfair, and fraudulent business acts or

21

practices in violation of California's Unfair Competition Law, California Business & Professions Code § 17200, et seq. (the "UCL").

144.    Defendants' business practices are unlawful because, as detailed through this complaint, they constitute (1) violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder; (2) numerous violations of the CLRA; (3) UCL violations for Unfair Business Practices; (4) Violations of Cal. Bus. & Prof. Code § 17500 for False Advertising; and/or (4) Negligent Misrepresentation.

145.    A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.  A business act or practice is also "unfair" under the UCL if Defendants' conduct or practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

146.    A business act or practice is also "unfair" under the UCL where the consumer injury is substantial; the injury is not outweighed by any countervailing benefits to consumers or competition; and the injury is one that consumers themselves could not reasonably have avoided.

147.    Defendants' conduct as detailed herein constitutes unfair business acts and practices.

148.    Throughout the Class Period, Defendants enticed Plaintiff and the Class to use their services by trading securities through their platform by prominently representing that all Robinhood trades are "commission-free" and representing to the public that their order execution quality matched or beat their competitors.

149.    These representations were false and made despite Defendants knowing that they were receiving most of their income through backdoor payment for order flow—the costs of which were passed onto consumers—and despite that fact that Robinhood's order execution quality was substantially worse than its competitors in many material respects.

150.    By March of 2019, Defendants' own internal studies definitively confirmed the inferiority of its execution quality; yet Defendants continued to mislead consumers until at least June 2019, and Defendants continued to provide substandard execution quality to millions of customers by charging unusually high payment for order fees to its vendors.

151.    Defendants owed Plaintiff and the Class a well-established duty of best execution.

However, Defendants knowingly breached this duty in order to unfairly gain advantage over its business competitors through Defendants' misleading promise of "commission-free" trading services that were knowingly offset by undisclosed backdoor fees that were passed along to consumers.

152. Defendants' misleading "commission-free" guarantee is largely and ultimately illusory, as any benefit their clients obtain from Defendants' purportedly "commission-free" trading are undermined, and in many cases exceeded, by the significant costs of substandard execution quality.

153. Plaintiff and other Class members had no way of reasonably knowing that they were receiving substandard execution quality on their purportedly "commission-free" orders.

154. The harm and consequences of Defendants' conduct as detailed herein outweigh any justification, motive or reason for Defendants' conduct. Defendants' conduct is and continues to be unlawful, immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff and the Class. Further, Defendants' actions are a fraud to the public markets, as the misleading and substandard trading execution quality adversely impacts the values of all securities for which Defendants engage in trading activities.

155. Defendants' business practices, as described herein, also are "fraudulent" because they are likely to deceive the general public and because Defendants falsely represented that their services have characteristics they do not have, namely, best execution; falsely represented that their services are of a particular standard when they are of another; advertised their services with intent not to sell them as advertised; represented that the subject of a transaction was supplied in accordance with a previous representation when it was not; and/or made material omissions regarding the quality of their services.

156. Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendants not engaged in unlawful business practices and/or unfair competition, including by ordering restitution of all funds that Defendants may have acquired as a result of these practices.

157. Plaintiff further requests an injunction prohibiting further legal violations, including but not limited to requiring Defendants to disclose and itemize all charges and fees bearing upon the execution quality experienced by their clients and a cease and desist order requiring Defendants to remove, retract, and/or correct all materially misleading statements and omissions regarding

"commission-free" trading when Defendants in fact charges back door commissions through their demand of substantial payment for order flow.

158.	Defendants' conduct has caused substantial injury to Plaintiff and other Class members, and that injury is not outweighed by any countervailing benefits to consumers.

159.	Plaintiff and the Class could not have reasonably avoided such injury.

160.	As a result of Defendants' unlawful, unfair, and fraudulent business acts and practices, Plaintiff and other Class Members have suffered injury in fact and lost money or property.

161.	Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendants not engaged in unfair competition, including by ordering restitution of all funds that Defendants may have acquired as a result of these practices and an injunction prohibiting further unfair business practices.

## FOURTH CAUSE OF ACTION

### Violations of FAL, Bus. & Prof. Code § 17500, et seq.

162.	Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

163.	From at least September 2016 to June 2019, Defendants, with the intent to directly or indirectly perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public, Plaintiff, and the putative class, statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Defendants knew or in the exercise of reasonable care should have known were untrue or misleading, in violation of Business and Professions Code section 17500, et seq.

164.	Separately and in addition, Defendants knowingly made the false and misleading statements and omissions discussed in this complaint as part of a plan or scheme with the intent not to provide the services advertised.

165.	Robinhood prominently featured its unlimited "commission-free" trading, while knowingly refusing to disclose backend fees that uniformly caused substandard execution quality to its millions of customers.

166.	Such false and/or misleading statements include but are not limited to all of the

representations set forth and discussed in the previous paragraphs of this complaint, all of which are incorporated herein by this reference.

167. Plaintiff requests that the Court issue sufficient equitable relief to restore Class members to the position they would have been in had Defendants not engaged in false advertising, including by ordering restitution of all funds that Defendants may have acquired as a result of these practices and an injunction prohibiting further misleading practices.

## FIFTH CAUSE OF ACTION

### Negligent Misrepresentation

168. Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

169. Defendants represented to Plaintiff that a material fact was true; namely, that if they placed orders through Robinhood, they would receive commission-free trading at an execution quality that matched or exceeded the execution quality of Robinhood's competitors.

170. Defendants' representation and warranty was not true, as their clients routinely received substandard execution quality due to the payment for order flow demands made by Robinhood as a prerequisite to sending order flow to its vendor electronic market makers.

171. Defendants knew about their payment for order flow scheme and that these payments necessarily caused substandard execution quality for their clients. Yet, as stated above, Defendants intentionally concealed their payment for order flow demands from consumers, including how Robinhood's payment for order flow plan, practice, and scheme affected the execution quality of orders placed on the Robinhood platform.

172. Defendants never intended to provide the promised services on a "commission-free" basis, as Defendants knowingly used their clients' order flow as specific leverage to extract specific payments from third parties for the right to process each of Defendants' clients' orders.

173. Even if Defendants believed that the representations were true, Defendants had no reasonable grounds for believing that they were true when made given the way Robinhood's backdoor payment for order flow costs and charges would necessarily be passed onto their clients by third party electronic market makers.

174. The electronic market makers could have, and were otherwise obligated to, offer

Defendants' clients better execution quality, if not for Defendants' payment for order flow scheme.

175.     Defendants intended that Plaintiff and the Class would rely on their representations regarding "commission-free" trading so that they would use the Robinhood platform to order trades and other market transactions.

176.     Plaintiff and the Class reasonably relied on Defendants' representations in using Robinhood's trading services and making orders on the Robinhood platform.

177.     Plaintiff and the Class were harmed through fraudulent inducement.

178.     Plaintiff's and the Class' reliance on Defendants' representations was a substantial factor in causing their harm.

179.     As a result of Defendants' misrepresentation(s), Plaintiff and other Class Members have been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Breach of Implied Covenant of Good Faith and Fair Dealing

180.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

181.     Defendants unfairly interfered with Plaintiff's and Class members' rights to receive the full benefits of their trades on Defendants' platform to which they were entitled by, *inter alia*, failing to provide adequate trade execution quality by prioritizing their profits through payment for order flow at the expense of their customers.

182.     Defendants' conduct has breached the implied covenant of good faith and fair dealing because they have caused and continue to cause Plaintiff and the Class harm, loss, and damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### Breach of Fiduciary Duty

183.     Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

184.     As providers of financial services and registered securities investment dealers, Defendants were fiduciaries to Plaintiff and the Class, owing them the highest good faith and integrity in performing financial services and acting as securities brokers on their behalf.

185.     Defendants also maintain discretionary control over customer accounts and take

commissions for exercising such discretionary actions, thus assuming all the fiduciary responsibilities associated with their retention of discretion to exercise trades and other transactions with or without customer direction.

186.    Defendants breached their fiduciary duties to Plaintiff and the Class by, *inter alia*, failing to provide adequate trade execution quality by prioritizing their profits through payment for order flow at the expense of their customers.

187.    Defendants' conduct has caused and continues to cause Plaintiff and Class members harm, loss, and damages by having breached and continuing to breach their fiduciary duties in an amount to be determined at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the class of similarly situated individuals, requests the Court to:

(a)    Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiff as representative of the class and designate counsel of record as class counsel;

(b)    Order Defendants to provide actual damages and equitable monetary relief (including restitution) to Plaintiff and class members and/or order Defendants to disgorge profits they realized as a result of their unlawful conduct;

(c)    Order Defendants to pay punitive damages, as allowable by law, to Plaintiff and class members;

(d)    Declare Defendants' conduct unlawful and enter an order enjoining Defendants from continuing to engage in the conduct alleged herein;

(e)    For both pre and post-judgment interest at the maximum allowable rate on any amounts awarded;

(f)    For costs of the proceedings herein;

(g)    For reasonable attorneys' fees as allowed by law; and

(h)    Award such other relief as the Court deems appropriate under the circumstances.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 5, 2021

Respectfully submitted,

**AHDOOT & WOLFSON, PC**

*/s/ Tina Wolfson*
Tina Wolfson (SBN 174806)
Robert Ahdoot (SBN 172098)
Bradley K. King (SBN 274399)
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com
bking@ahdootwolfson.com

**LIDDLE & DUBIN, P.C**.
Nicholas A. Coulson (PHV forthcoming)
Matthew Z. Robb (PHV forthcoming)
975 E. Jefferson Ave.
Detroit, Michigan 48207
Tel: 313-392-0015
Fax: 313-392-0025
ncoulson@ldclassaction.com
mrobb@ldclassaction.com

*Attorneys for Plaintiff and the Putative Class*

## **AFFIDAVIT OF TINA WOLFSON**

I, Tina Wolfson, declare as follows:

1. I am an attorney with the law firm of Ahdoot & Wolfson, PC, counsel for Plaintiff in this action. I am admitted to practice law in California and before this Court, and am a member in good standing of the State Bar of California. This declaration is made pursuant to California Civil Code section 1780(d). I make this declaration based on my research of public records and upon personal knowledge and, if called upon to do so, could and would testify competently thereto.

2. Venue is proper in this Court because many of the acts and transactions giving rise to this action occurred in this District, and Defendant (1) is authorized and registered to conduct business in this District, (2) has intentionally availed itself of the laws and markets of the State of California through the distribution and sale of its services in this District, and (3) is headquartered in this District.

3. Plaintiff Ji Kwon is resident of Camarillo, California.

4. Defendant Robinhood Financial LLC is a Delaware limited liability company with its principal place of business located at 85 Willow Road, Menlo Park, California.

**5.** Defendant Robinhood Securities, LLC is a Delaware limited liability company with its principal place of business located at 85 Willow Road, Menlo Park, California.

I declare under penalty of perjury under the laws of the United States and the State of California this 5th day of January, 2021 in Burbank, California that the foregoing is true and correct.


*/s/ Tina Wolfson*
Tina Wolfson