Nicholas A. Coulson (admitted *pro hac vice*)
ncoulson@lsccounsel.com
Matthew Z. Robb (admitted *pro hac vice*)
mrobb@lsccounsel.com
**LIDDLE SHEETS COULSON P.C**.
975 E. Jefferson Ave.
Detroit, Michigan 48207
Tel: 313-392-0015; Fax: 313-392-0025

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Bradley King (SBN 274399)
bking@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, California 91505
Tel: (310) 474-9111; Fax: (310) 474-8585

Scott A. Bursor (SBN 276006)
scott@bursor.com
Sarah Westcot (SBN 264916)
swestcot@bursor.com
**BURSOR & FISHER, P.A.**
701 Brickell Ave, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512; Fax: (305) 679-9006

*Plaintiff's Co-Lead Counsel*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE ROBINHOOD ORDER FLOW LITIGATION | Master File No. 4:20-cv-09328-YGR<br><br>**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND**<br><br><br>Judge:       Hon. Yvonne Gonzalez Rogers<br>Courtroom:  1 – 4th Floor |

**INTRODUCTION**

1.      Plaintiff Ji Kwon ("Plaintiff"), by and through his counsel, files this Second Consolidated Amended Class Action Complaint against Robinhood Financial LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood Securities"), and Robinhood Markets, Inc. ("Robinhood Markets") (collectively, "Defendants" or "Robinhood") on behalf of himself and on behalf of a class of similarly situated individuals, and alleges, upon personal knowledge as to his own actions, and upon investigation of counsel as to all other matters, as follows:

**NATURE OF THE ACTION**

2.      Robinhood, a multi-billion dollar mobile application and website investment service, has capitalized on a surge of first-time market investors by misleading and luring unsuspecting consumers to execute inferior market trades on the platform under the guise of "commission free" trading.

3.      Through a process of deceit and omission, Defendants misled consumers and failed to disclose that, unlike its competitors, Robinhood's business operations relied extensively upon "payment for order flow" (in which Defendants received payment from market makers in exchange for executing the service's trades) to an extent previously unseen in the industry.

4.      In general, these payments were made available to Robinhood at the expense of the consumer. While Defendants promoted and advertised an easy-to-use "commission free" trading platform, Defendants profited extensively from unsuspecting consumers who executed trades on Defendants' platform at inferior execution prices compared to what consumers would have received from Robinhood's competitors. For larger value orders, this price differential often exceeded the commission its competitors would have charged. These inferior prices were caused in large part by the unusually high charges Robinhood required from principal trading firms for the opportunity to obtain Robinhood's customer order flow.

5.      The principal trading firms/electronic market makers in turn passed these costs along to Robinhood's clients on each trade through inferior execution quality—the price at which the requested market orders were executed.

6.      Robinhood's key selling point, and what differentiated it from its competitors, was that it did not charge commissions. In one sense, that was simply untrue because the inferior execution price

its customers received amounted to a form of indirect commission[1]: a cost imposed on each trade that resulted in profits for Robinhood. In another sense, and at a minimum, this key selling point gave Robinhood users the impression that they were not incurring any expenses on a per-trade basis with Robinhood, which was false and misleading. Robinhood's repeated references to a supposed lack of commissions created a heightened obligation for it to disclose its unprecedented, aggressive payment for order flow scheme, but instead Robinhood concealed and denied the scheme.

7. To effectuate this scheme, Defendants published misleading statements and omissions in customer communications relating to the execution of trades and Robinhood's revenue sources. For years, Robinhood's retail communications to consumers omitted receipt of payment for order flow, even though it was Robinhood's single largest source of revenue and even though Robinhood purported to publicly list and disclose its revenue sources.

8. Robinhood failed to disclose and omitted information regarding this process in numerous ways, including instructing customer service representatives not to mention payment for order flow in response to questions about Robinhood's sources of revenue and omitting it from its website's FAQ section about Robinhood's revenue sources.

9. As a broker-dealer that routed customer orders for execution, Robinhood had a duty of best execution to its clients, a duty to seek and obtain the best reasonably available terms for customers' orders. Robinhood knowingly violated its duty of best execution by charging unusually high payment for order flow rates to its vendors and failing to conduct adequate regular and rigorous reviews of the execution quality it was providing on customer orders.

10. Plaintiff brings this action on behalf of himself and a class of similarly situated individuals who were victims of Defendants' materially deceptive acts and omissions, relying upon Robinhood's warranties, advertisements, and representations, as well as Robinhood's duty of best execution in executing trades on consumer's behalf.

---

[1] Merriam-Webster dictionary includes among its definitions of "commission" as "a fee paid to an agent or employee for transacting a piece of business or performing a service[,]" as well as "a percentage of the money received from a total paid to the agent responsible for the business." https://www.merriam-webster.com/dictionary/commission (last visited Mar. 4, 2022). A commission need not be a fixed dollar figure, and it need not be charged separately from the price paid or received for the sale of securities.

11.     Defendants have quietly sought to force their customers to execute trades on Defendants' platform at inferior prices compared to what consumers would have received from Robinhood's competitors, while profiting on the back end of those trades.

12.     Defendants uniform conduct is equally applicable to the class. Plaintiff brings this class action against Defendants for: (1) Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.

13.     Plaintiff seeks an order for relief including but not limited to the following: (1) requiring Defendants to pay damages and restitution to Plaintiff and the Class; and (2) enjoining Defendants from further legal violations through Robinhood's unique payment for order flow collection scheme and requiring Defendants to publicly correct the false and misleading statements and omissions alleged herein.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction pursuant to the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* This Court also has Class Action Fairness Act (CAFA) jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(a). CAFA jurisdiction is appropriate as this action's amount in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are numerous class members who are citizens of states different from Defendants.

15.     This Court has personal jurisdiction over Defendants because Defendants are citizens of California, conduct significant, substantial, and not-isolated business activities in California and a substantial portion of the acts complained of took place in California.

16.     Venue is proper in the Northern District of California because Defendants conduct business in this District and many of the events that gave rise to Plaintiff's claims occurred in this District.

## PARTIES

17.     Plaintiff Ji Kwon is an individual and citizen of California for jurisdictional purposes.

18.     Defendant Robinhood Financial LLC is a Delaware LLC with its principal place of business located at 85 Willow Road, City of Menlo Park, County of San Mateo, State of California.

19.      Defendant Robinhood Securities, LLC is a Delaware LLC with its principal place of

3

business located at 85 Willow Road, City of Menlo Park, County of San Mateo, State of California.

20.     Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business located at 85 Willow Road, City of Menlo Park, County of San Mateo, State of California.

## FACTUAL ALLEGATIONS

### A.     Background

21.     Robinhood offers self-directed securities brokerage services to customers by means of its website and smartphone applications. Robinhood is a Commission-registered broker-dealer and a member of Financial Industry Regulatory Authority ("FINRA"). Robinhood Financial acts as an introducing broker and has a clearing arrangement with Robinhood Securities. When customers open accounts with Robinhood, they enter into a customer agreement with Robinhood Financial and Robinhood Securities, which work together to execute customers' orders.

22.     Robinhood was founded in 2013 and began offering retail brokerage accounts to the general public in March 2015. Robinhood distinguished itself from other retail-oriented broker-dealers by, chiefly among other things, allowing customers to place orders to buy and sell securities without paying a trading commission. It was this price-value proposition that allowed Robinhood to rapidly grow.

23.     By June 2019, Robinhood had 9 million approved customer accounts.

### B.     Principal Trading Firms and Payment for Order Flow

24.     Rather than sending customer orders to buy or sell equity securities directly to national exchanges, Robinhood, like other retail broker-dealers, routed its orders to other broker-dealers (often referred to as "principal trading firms" or "electronic market makers") to either execute those orders or route them to other market centers.

25.     Principal trading firms attempt to profit from executing large volumes of retail buy and sell orders either by taking the other side of customer orders and exiting the positions at a profit, which is also known as "internalization," or by routing the orders to other market centers.

26.     Historically, market makers paid fees to regional intermediaries for their services in executing trades with other local firms on behalf of the market maker. In order to grow a guaranteed supply of liquidity in their markets, market makers began offering payments to not only the intermediaries, but also retail firms, including brokers, in exchange for the retail firms routing their

orders to the market makers. This practice, which expanded from off-exchange securities (over-the-counter or "OTC" securities) to exchange-traded securities, came to be known as "payment for order flow." Over time, different types of venues, including Electronic Communication Networks ("ECNs") and exchanges, also began making payments for order flow.

27.     Principal trading firms offer incentives to retail broker-dealers to send them order flow. One such incentive is "payment for order flow," which is defined in Rule 10b-10(d)(8) of the Exchange Act to include any monetary payment, service, property, or other benefit that results in remuneration, compensation, or consideration to a broker-dealer in return for the routing of customer orders.

28.     Since it began operating as a broker-dealer, Robinhood, like other retail broker-dealers, has received payment for order flow in exchange for routing its customer orders to principal trading firms.

29.     SEC rules permit the receipt of payment for order flow by broker-dealers as long as it does not interfere with their efforts to obtain best execution, and as long as the routing of that order flow, as well as a description of all terms of any such arrangements that may influence the broker-dealer's order routing decision, are disclosed in quarterly reports filed pursuant to 17 C.F.R. § 242.606 (Disclosure of order routing information, "SEC Rule 606").

30.     A related incentive that principal trading firms may provide to retail broker-dealers is "price improvement" on customer executions. Price improvement occurs when a customer order receives an execution at a price that is superior to the best available quotation then appearing on the public quotation feed, that is, by executing a "buy" order at a price lower than the lowest prevailing offer or executing a "sell" order at a price higher than the highest prevailing bid.

31.     Price improvement creates a direct financial benefit for the customer, since the customer receives a better price than he or she would have received had the order been executed at the national best bid and offer ("NBBO") on the public quotation feed.

32.     Price improvement and payment for order flow are paid from the same pool of money. In other words, principal trading firms make available certain resources in order to drive order flow to themselves. Those resources can be paid as price improvement, payment for order flow, or some combination of the two.

33.     In practice, most retail broker-dealers obtain price improvement on the vast majority of customer orders that they send to principal trading firms.

**C.     The Duty of Best Execution**

34.     Broker-dealers such as Robinhood owe their customers a duty of "best execution." Best execution requires that a broker-dealer endeavor to execute customer orders on the most favorable terms reasonably available in the market under the circumstances. This includes taking into account price, order size, trading characteristics of the security, as well as the potential for price improvement and other factors. *See Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 135 F.3d 266, 270 & n.2 (3d Cir. 1998); *Marc N. Geman*, Securities Exchange Act Release No. 43963 (Feb. 14, 2001) (Commission opinion).

35.     Although a broker-dealer is not required to examine every customer order individually for compliance with its duty of best execution, it must undertake regular and rigorous reviews of the quality of its customer order executions. *See Payment for Order Flow*, Securities and Exchange Commission Final Rule Release, Exchange Act Release No. 34902, 59 Fed. Reg. 55006, at 55009 (Oct. 27, 1994) (*"Payment for Order Flow Release"*).

36.     The duty of best execution derives from, among other sources, the common law agency duty of loyalty, which obligates an agent to act exclusively in the principal's best interest. Payment for order flow has the potential to create a conflict of interest between the broker-dealer and its customer because payment for order flow is a benefit that goes to the broker-dealer itself, whereas other incentives that may be obtained for routing order flow, such as price improvement, benefit the broker-dealer's customers. A broker-dealer must not allow payment for order flow to interfere with its efforts to obtain best execution. *See Payment for Order Flow Release*, at 55009 & n.28.

37.     In the context of transacting in securities, best execution requires that, when conducting a transaction on behalf of a client, a broker seek the terms most favorable to the client that can possibly be obtained given the present circumstances.

38.     When securities are traded in different venues, best execution requires that, absent instruction otherwise from the client, a broker-dealer ensure that the client's order be routed to the best possible venue. A broker achieves best execution when it endeavors to obtain the best price available, execute the transaction in the shortest possible time frame, maximize the likelihood that the transaction

is executed in its entirety, and, where possible, seek "price improvement"—the execution of a trade at a price better than the best current public quote.

39.     NASD Rule 2320 provided that Robinhood, as a broker-dealer, would "use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions."

40.     The factors to be considered in determining reasonable diligence were "(A) the character of the market for the security, e.g., price, volatility, relative liquidity, and pressure on available communications; (B) the size and type of transaction; (C) the number of markets checked; (D) accessibility of the quotation; and (E) the terms and conditions of the order which result in the transaction, as communicated to" Robinhood.

41.     Financial Industry Regulatory Authority ("FINRA") Rule 5310, which superseded NASD Rule 2320 on May 31, 2012, incorporates all of that Rule's provisions concerning a broker-dealer's duty of best execution.

42.     Throughout the Class Period, Robinhood recognized that it had the duty to seek best execution for its clients and made representations that its execution quality and speed matched or beat what's found at other major brokerages.

43.     However, Robinhood failed to disclose throughout the Class Period that its duty of best execution was materially undermined by a payment for order flow pursuant to, among other things, its contractual agreements with principal trading firms. Specifically, Robinhood failed to disclose throughout the Class Period the following facts as they related to its duty of best execution:

> a.     The payment for order flow rates for which Robinhood contracted drastically departed from industry standards;
>
> b.     Robinhood profited extensively from its payment for order flow; and
>
> c.     Robinhood damaged its clients by limiting the amount of "price improvement" available for customer trades, leading to poorer execution quality in violation of its duty of best execution.

44.     At all relevant times, Robinhood failed to disclose that it prioritized adherence to its agreement with its principal trading firms over the factors relevant to a proper best execution analysis.

45.     Robinhood's failure to disclose these material facts regarding its actual order routing practices caused Plaintiff and the Class to sustain substantial harm in the form of lost price improvement for customer orders.

46.     The duty of best execution is relevant in this case because it further establishes that Robinhood knew or should have known its representations and omissions were false and/or misleading.

**D.     Robinhood's Initial Public Messaging Concerning Payment for Order Flow**

47.     In 2014, prior to its public launch, Robinhood published an FAQ page on its website providing information about the company and its anticipated brokerage operations. The first version of the FAQ disclosed that Robinhood anticipated receiving payment for order flow in its answer to the question "How does Robinhood make money?"

48.     Also in 2014, a best-selling author published a book that chronicled various aspects of the electronic securities trading industry and portrayed payment for order flow as a controversial practice.[2]

49.     Several news organizations also published articles discussing payment for order flow and other issues concerning electronic trading venues.[3]

50.     Senior Robinhood personnel were aware of these publications and the ensuing controversy regarding payment for order flow and its association with principal trading firms (which were also sometimes referred to as "high frequency trading firms"). They became concerned that if the public associated Robinhood with payment for order flow and high frequency trading firms, it could be viewed as controversial by Robinhood's customers.

51.     In light of these concerns, in December 2014, Robinhood removed the reference to payment for order flow from its answer to the "How does Robinhood make money" FAQ and created a new FAQ page that specifically discussed payment for order flow.

52.     This new FAQ page stated that the payment for order flow revenue Robinhood received

---

[2] https://www.pbs.org/newshour/show/flash-boys-investigates-high-frequency-traders-anticipate-wall-streets-next-move-faster (last visited December 21, 2020).

[3] https://www.ft.com/content/97810c5e-fd1c-11e3-8ca9-00144feab7de (last visited December 21, 2020).

at the time was "indirect" and "negligible." It also stated that if payment for order flow ever became a direct or significant source of revenue, Robinhood would inform customers of those facts on the "How does Robinhood make money" FAQ page. This demonstrates that Robinhood knew the materiality of disclosing or failing to disclose payment for order flow as a significant source of revenue.

53.     In the first quarter of 2015, Robinhood launched its trading platform to the public. Although the company's overall revenue was modest in 2015 through mid-2016, during that time payment for order flow comprised more than 80% of the company's revenue.

54.     These payments received for order flow were directly related to client orders and constituted a significant amount of the company's revenue. Yet, Robinhood concealed these facts from its clients.

**E.     Robinhood Received Unusually High Payment for Order Flow Rates and Failed to Conduct Rigorous Reviews of its Execution Quality**

55.     Initially, Robinhood relied on another broker-dealer to provide both clearing and order execution services for Robinhood customer orders. That broker-dealer routed Robinhood customer orders to principal trading firms, received payment for order flow in return, and shared a portion of that payment for order flow with Robinhood.

56.     During the first half of 2016, Robinhood decided to start routing customer orders directly to principal trading firms and cease relying on the other broker-dealer for order execution routing services. By doing so, Robinhood could earn additional payment for order flow revenue.

57.     In or around May 2016, Robinhood began negotiations with a number of principal trading firms about potentially routing Robinhood customer orders to those entities.

58.     During those negotiations, certain principal trading firms told Robinhood that there was a trade-off between payment for order flow on the one hand and price improvement on the other: If Robinhood negotiated for higher payment for order flow revenue, according to the principal trading firms, there would be less money available for the principal trading firms to provide price improvement to Robinhood's customers.

59.     This makes sense because payment for order flow and price improvement are ultimately paid out of the same pool of resources.

60.     At least one principal trading firm communicated to Robinhood that large retail broker-dealers that receive payment for order flow typically receive four times as much price improvement for customers as they do payment for order flow for themselves—an 80/20 split of the value between price improvement and payment for order flow.

61.     Robinhood negotiated a payment for order flow rate that was substantially and unusually higher than the rate the principal trading firms paid to other retail broker-dealers—which resulted in approximately a 20/80 split of the value between price improvement and payment for order flow.

62.     Robinhood therefore claimed for itself four times as much payment for order flow as was customary and practiced by its competitors. It also left for its customers 25% as much price improvement as was customary and practiced by its competitors.

63.     Robinhood explicitly agreed to accept less price improvement for its customers than what the principal trading firms were offering, in exchange for receiving a higher rate of payment for order flow for itself. However, Robinhood did not disclose this fact to its clients.

64.     In September 2016, Robinhood began routing customer orders directly and solely to principal trading firms. Around the same time, Robinhood formed a "Best Execution Committee" (hereafter, "Committee") to monitor the speed and the prices at which the principal trading firms were executing Robinhood customer orders. The Committee met at least once per month and included Robinhood's General Counsel. From October 2016 through at least June 2019, the Committee observed that Robinhood was not obtaining much price improvement on its customer orders in equity securities, particularly on orders of 100 shares or more.

65.     The foregoing was and should have been obvious, given that Robinhood's primary source of revenue was to take for itself the substantial majority of the money that would have otherwise been available to its customers in the form of price improvement.

66.     Meanwhile, in 2017, Robinhood developed a proprietary routing algorithm, known as a smart order router, designed to make the principal trading firms with which Robinhood had payment for order flow arrangements compete for order flow by routing customer orders to the principal trading firm that had provided the most price improvement for that stock over the prior 30 days. However, the smart order router did not address Robinhood's high payment for order flow rates or any potential execution

prices that may be available at venues that did not agree to pay those rates. Even with its "smart" order router, Robinhood customer orders received poor execution quality.

67.     The smart order router functionally chose the best of the bad options Robinhood had preselected for its customers by plundering the resources available to get them good prices on their trades.

68.     Although Robinhood was on notice that its high payment for order flow rates could lead to less price improvement, the Committee did not conduct adequate, regular, and rigorous reviews to ensure that Robinhood was satisfying its best execution obligations.

69.     Given the obviousness of the inferiority of Robinhood's price improvement, the seriousness of the Committee was questionable, at best. Robinhood's own deliberate actions to plunder the resources available to ensure good execution prices for its customers farcically undermined the committee's stated purpose by hamstringing it from the beginning (to the extent it even had a legitimate purpose).

70.     Perhaps predictably, the Committee took no steps to determine whether Robinhood's payment for order flow rates were having a negative impact on the execution prices that Robinhood's customers received. Until October 2018, the Committee did not consider how Robinhood's price improvement statistics compared to those of other retail broker-dealers, or to the retail order execution market generally.

71.     In mid-2017, when one of the principal trading firms to which Robinhood routed order flow told Robinhood it would no longer agree to pay Robinhood's unusually high payment for order flow rates, but it would pay a lower payment for order flow rate, Robinhood stopped routing customer orders to that principal trading firm.

72.     When certain Robinhood personnel began comparing the firm's order execution quality to competitors in October 2018, they learned that for most execution quality metrics, including the percentage of orders receiving price improvement, Robinhood's execution quality was worse.

73.     By March 2019, Robinhood had conducted a more extensive internal analysis, which showed that its execution quality and price improvement metrics were substantially worse than other retail broker-dealers by many of the relevant metrics, including the percentage of orders that received

price improvement and the amount of price improvement, measured on a per order, per share, and per dollar traded basis. Senior Robinhood personnel were aware of this analysis.

74.     However, Robinhood's Committee did not take appropriate steps to assess whether, in light of this information, Robinhood was complying with its duty to seek best execution of customer orders. Robinhood's failure from October 2016 through at least June 2019 to conduct adequate regular and rigorous reviews that involved benchmarking its execution quality against competitor broker-dealers to determine whether it was obtaining the best terms reasonably available for customer orders, violated the firm's duty of best execution and rendered its public disclosures regarding how it profited from consumer trades incomplete and misleading.

**F.      Robinhood Misleadingly Omitted Payment for Order Flow From Descriptions of Its Revenue Sources**

75.     By the end of 2016, Robinhood was generating a significant amount of revenue, the majority of which its controlling officers knew continued to come from payment for order flow. However, contrary to what the company had said in the payment for order flow FAQ, Robinhood did *not* disclose the new payment for order flow arrangements in its answer to the "How Robinhood Makes Money" FAQ on its website, despite deliberately creating the impression that it was disclosing all of its significant sources of revenue. Instead, at some point during 2016, Robinhood deleted the payment for order flow FAQ altogether.

76.     Robinhood kept no records showing when the payment for order flow FAQ was deleted, why it was deleted, or who was responsible for approving its removal.

77.     Between late 2016 and September 2018, Robinhood continued to grow rapidly. Although payment for order flow remained the company's largest revenue source throughout this period, Robinhood did not include payment for order flow as a revenue source in its answer to the "How Robinhood Makes Money" FAQ on its website, despite deliberately creating the impression that it was disclosing all of its significant sources of revenue and despite the fact that its repeated references to commission free trading created an additional duty to disclose its unique business model.

78.     The company failed to update the FAQ to include payment for order flow despite the fact that, in 2016 and 2017, the company did update the FAQ to include two other, smaller revenue sources:

subscription-based memberships and interest on securities lending. The version of the "How Robinhood Makes Money" FAQ page that was posted on Robinhood's website from approximately April 2017 through September 2018 stated:



### How Robinhood Makes Money

**Robinhood Support**
April 14, 2017 19:22

Follow

#### How does Robinhood make money?

With Robinhood Gold, you get up to 2x your buying power and access to after hours trading for as little as $10 per month. This is the only product Robinhood charges you for, and is completely optional. Trading is still commission free.

Additionally, Robinhood earns revenue by collecting interest on the cash and securities in Robinhood accounts, much like a bank collects interest on cash deposits.

79.     Robinhood kept incomplete records of its updates to the "How Robinhood Makes Money" FAQ page, including incomplete records of who was responsible for approving updates to that page.

80.     The "How Robinhood Makes Money" FAQ was featured in certain of Robinhood's customer communications. From at least February 22, 2016 to October 26, 2017 Robinhood displayed a link to the "How Robinhood Makes Money" FAQ on the home page of its website:



81. Moreover, Robinhood instructed customer service representatives to direct customers to the "How Robinhood Makes Money" FAQ page or use the language of the misleading FAQ answer when responding to general questions about how Robinhood made money. Thus, in response to inquiries from its customers between 2015 and August 2018 about how Robinhood made money—approximately 150 inquiries in total—Robinhood's customer service representatives did not identify payment for order flow as one of the company's revenue sources, a deliberately misleading misstatement and omission.

82. Training documents for customer service representatives in early 2018 explicitly instructed them to "avoid" talking about payment for order flow and stated that it was "incorrect" to identify payment for order flow in response to the question how Robinhood makes money.

83. Throughout this period, Robinhood disclosed some information about its receipt of payment for order flow as required in SEC-mandated reports pursuant to Rule 606. The company included these reports on the "Disclosure Library" page on its website that included a number of other legally-mandated disclosures. However, the company did not feature the document-dense "Disclosure Library" or the reports contained in that library prominently in its communication strategy, like it did with the "How Robinhood Makes Money" FAQ page.

84. More importantly, even where Robinhood did disclose that it was receiving *some* payment for order flow (the Rule 606 reports), it did not disclose what would have been necessary to correct its own false and misleading statements and omissions; *that it was receiving four times the industry standard of payment for order flow and as a result its customers were losing 75% of the funds that would otherwise have been available to them in the form of price improvement*.

85. Robinhood's customer agreements and trade confirmations stated only vaguely that Robinhood "may" receive payment for order flow, but also fail to disclose what would have been necessary to correct Robinhood's own false and misleading statements and omissions.

### G. Robinhood Falsely Claimed That Its Execution Quality Matches or Beats That of Its Competitors

86. In response to media reports in September and October 2018 about Robinhood's payment for order flow rates, Robinhood added payment for order flow to the list of revenue sources appearing on the "How Robinhood Makes Money" FAQ page.

87.     But on October 12, 2018, it also published a new FAQ page that discussed payment for order flow and Robinhood's order execution quality. The new FAQ page stated that Robinhood's "execution quality and speed matches or beats what's found at other major brokerages." It also cited one statistic related to execution speed and one statistic related to the percentage of orders for S&P 500 stocks executed within the NBBO.

**What is the execution quality for orders on Robinhood?**

Reg NMS ensures your order gets executed at the national best bid and offer, or better, at the time of execution. Our execution quality and speed matches or beats what's found at other major brokerages. Even when measured at the time of routing, our customers' orders get executed at the NBBO or better. By way of example, in August 2018, 99.12% of our customers' marketable orders were executed at the national best bid and offer or better with an execution speed of 0.08 seconds from routing to execution (for S&P 500 stocks, during market hours).

88.     However, execution quality is a function of multiple factors, including the amount of price improvement received, and the internal analyses referenced in the paragraphs above that Robinhood conducted in October 2018 and March 2019 showed that Robinhood's execution quality was worse than that of other large retail broker-dealers in many important respects. In particular, in October 2018, when certain Robinhood employees began gathering data to compare Robinhood's execution quality metrics to those of its competitors, other Robinhood personnel remarked that most of Robinhood's metrics were worse and discussed the execution quality metrics with certain senior Robinhood personnel.

89.     A more extensive analysis Robinhood conducted in March 2019 stated that "[n]o matter how we cut the data, our % orders receiving price improvement lags behind that of other retail brokerages by a wide margin."

90.     Robinhood further found that the *amount* of price improvement obtained for Robinhood customers was far lower than at competing broker-dealers, measured on a per order, per share, and per dollar traded basis. Senior Robinhood personnel were aware of this analysis.

91.     For most orders of more than 100 shares, the analysis concluded that Robinhood customers would be better off trading at another broker-dealer because the additional price improvement that such orders would receive at other broker-dealers would likely exceed the approximately $5 per-order commission costs that those broker-dealers were then charging.

92.     The analysis further determined that the larger the order, the more significant the price improvement losses for Robinhood customers—for orders over 500 shares, the average Robinhood customer order lost over $15 in price improvement compared to Robinhood's competitors, with that comparative loss rising to more than $23 per order for orders over 2,000 shares.

93.     It is inconceivable that the statement that Robinhood's execution quality meets or beats that of its competitors could be anything other than false and/or misleading when by its own analyses Robinhood knew that the metrics that customers would actually care about pointed strongly to worse execution quality than that of its competitors.

94.     Robinhood removed the claim about Robinhood's execution quality matching or beating that of other broker-dealers from its FAQ in June 2019, after staff from the Commission's Office of Compliance Inspections and Examinations raised concerns about that sentence.

95.     Between October 2016 and June 2019, certain Robinhood orders lost a total of approximately $34.1 million in price improvement compared to the price improvement they would have received had they been placed at competing retail broker-dealers, even after netting the approximately $5 per-order commission costs those broker-dealers were charging at the time.

**H.     Plaintiff's Use of Defendants' Services**

96.     Plaintiff Ji Kwon was a user of Defendants' services from 2017 throughout the end of the Class Period midway through 2019.

97.     During the Class Period, Plaintiff made several thousand transactions through Defendants' platform, involving more than 257,000 shares and several million dollars.

98.     Plaintiff believed that his market orders would be executed by Defendants at the best available price, and he was unaware that Robinhood was receiving compensation directly related to his orders as payment for order flow.

99.     Plaintiff did not know that Robinhood's receipt of payment for order flow was causing him to receive such unfavorable market prices on his orders.

100.     Plaintiff purchased shares of U.S. based exchange-listed stocks in trades executed at purported market prices during the Class Period and, as a result thereof, suffered damages from Defendants' unlawful conduct and inferior execution quality.

101.    Robinhood, in its capacity as a broker, received payment for order flow from market-makers to which the company routed its client's orders.

102.    At all times relevant to this complaint, Robinhood was bound by a duty of best execution.

103.    Defendants have failed to provide best execution for their clients, causing them material harm in the form of economic loss due to their orders going unfilled, underfilled, filled at a suboptimal price, and/or filled in a manner which adversely affects the order's performance post-execution.

104.    By receiving higher payments for order flow than its competitors, Robinhood negatively impacted, among other things, its clients' order execution and chances for price improvement.

105.    Robinhood did not pass along the payment for order flow it received on market orders to the clients who placed the orders. Instead, the Company pocketed these payments for order flow for itself and failed to disclose to Plaintiff and the putative class that it received substantial payment for order flow, or that these payments had a direct, adverse impact on the prices its clients received on their orders.

106.    Defendants' promise to provide "commission free" trading at best execution of its clients' orders caused Plaintiff and the Class to do business with Defendants, even though they could have placed orders through broker-dealers offering similar digitized trading platforms.

107.    Plaintiff acted reasonably in relying on Defendants' promises to offer commission free trading at best execution compared to the offerings of Defendants' competitors.

108.    Defendants intended for Plaintiff and the Class to rely on those promises in order to induce potential clients to open accounts and begin making market trades on Robinhood's platform, instead of their competitors' platforms.

109.    Defendants, Defendants' agents, and Defendants' senior management knew that the "commission free" trading promise was misleading under the circumstances and that the company's substantial, required payment for order flow conditions placed on its principal trading firm vendors could, would, and did cause Defendants' clients to uniformly receive inferior execution quality on market orders.

110.    Plaintiff and the Class suffered economic damages because of Defendants' unfair, unlawful, deceptive and misleading material acts and omissions, and Defendants' scheme to charge backdoor commission fees without disclosing the impact of those fees on Plaintiff and the Class.

1

## CLASS ALLEGATIONS

2    111.    Plaintiff brings this class action under Rule 23 and seek certification of the claims and

3    issues in this action pursuant to the applicable provisions of Rule 23.  The proposed class is defined as:

4

5    **All persons in the United States or its Territories who were users of
     Robinhood between September 1, 2016 and June 16, 2020 and who placed
     orders in connection with which Defendants received payment for order
     flow (the "Class").**

6

7

8    Excluded from the Class are Defendants' officers, directors, and/or employees

9    112.    Plaintiff reserves the right to amend or modify the Class definitions with greater

10   specificity or division into subclasses after having had an opportunity to conduct discovery.

11   113.    Numerosity.  Fed. R. Civ. P. 23(a)(1).  The members of the Class are so numerous that

12   their individual joinder is impracticable. Defendants had some nine million user accounts in June of

13   2019. Plaintiff is informed and believes there are, at minimum, hundreds of thousands of Class Members

14   who have been damaged by the Robinhood's conduct as alleged herein. The exact size of the proposed

15   class and the identity of all class members can be readily ascertained from Defendants' records.

16   114.    Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law and fact

17   common to the class, which questions predominate over any questions affecting only individual class

18   members.  Common issues include:

19        A.    Whether the statements made by Defendants as part of their promises to provide,

20             and assertions that they do provide, best execution of their clients' orders,

21             discussed herein are true, or are reasonably likely to deceive, given the omissions

22             of material fact described above;

23        B.    Whether the federal securities laws were violated by Defendants' acts as alleged

24             herein;

25        C.    Whether statements made by the Defendants' officers, directors, and employees

26             to the investing public during the Class Period misrepresented material facts about

27             the business, operations and management of Defendants;

28        D.    Whether Defendants' conduct constitutes a breach of fiduciary duties and/or the

18

duty of best execution;

E.   The nature of the relief, including equitable relief, to which Plaintiff and the class
are entitled.

115.   Typicality.  Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of the claims of the Class he seeks to represent.  Plaintiff and all Class members were subject to and affected by the same conduct and omissions by Defendants. The claims alleged herein are based on the same violations by Defendants that harmed Plaintiff and members of the Class. By placing orders in connection with which Defendants received payment for order flow during the relevant time period, all members of the Class were subjected to the same wrongful conduct. Defendants' unlawful, unfair, deceptive, and/or fraudulent actions and breaches of the duty of best execution concern the same business practices described herein irrespective of where they occurred or were experienced.

116.   Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Further, Plaintiff's counsel is competent and experienced in litigating class actions, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

117.   Superiority.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to any other available means for the fair and efficient adjudication of this controversy.  The claims of Plaintiff and individual class members are small compared to the burden and expense that would be required to separately litigate their claims against Defendants, and it would be impracticable for class members to seek redress individually.  Litigating claims individually would also be wasteful to the resources of the parties and the judicial system and create the possibility of inconsistent or contradictory judgments.  Class treatment provides manageable judicial treatment which will bring an orderly and efficient conclusion to all claims arising from Defendants' misconduct.  Class certification is therefore appropriate under Rule 23(b)(3).

118.   Class certification is also appropriate under Rule 23(b)(1), as the prosecution of separate actions by individual members of the class would create the risk of adjudications with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudication and substantially impair their ability to protect those interests.

119.   Class certification is also appropriate under Rule 23(b)(2), as Defendants have acted

and/or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief appropriate for the class.

## **FIRST CAUSE OF ACTION**

### **Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(a)**

120.    Plaintiff incorporates all preceding factual allegations as if fully set forth herein.

121.    This Count is based upon Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10b-5(a) promulgated thereunder by the SEC.

122.    Rule 10b-5(a) provides that "[i]t shall be unlawful for any person, directly or indirectly . . . [t]o employ any device, scheme, or artifice to defraud . . . in connection with the purchase or sale of any security."

123.    Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Robinhood's routing of customer orders and any effect that Robinhood's routing procedures have, or are likely to have, on the execution quality of its clients' orders.

124.    Defendants further have a duty of best execution, by which Defendants, as a dealer-broker, are legally required to seek the best price reasonably available for their customers' orders.

125.    Throughout the Class Period, Defendants employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities, including by and through its contractual agreements with principal trading firms, in which customer orders were routed only to third party trading firms that agreed to render Robinhood's demanded payment for order flow.

126.    Robinhood intended to enter into such contractual agreements with its principal trading firms knowing that it would result in worse execution quality and less price improvement opportunities for Robinhood customers.

127.    This scheme employed by Defendants, was intended to, and throughout the Class Period did: (i) deceive Defendants' clients, including Plaintiff and other Class Members; (ii) cause the Class members to engage in a broker-client relationship with Defendants, which they otherwise would not have done; (iii) cause Plaintiff and the Class to make orders which they otherwise would not have placed; and (iv) deprive Plaintiff and the Class of the best execution and opportunities for price improvement of their orders.

128.    Further, Defendants knew that by failing to provide its clients with the best execution of their orders, including lost price improvement, each Plaintiff and Class Member would, and did, incur economic harm arising from executing Plaintiff's trades at prices less favorable than the best price available, including the chance to obtain a better price than the NBBO.

129.    Defendants and Defendants' senior management had actual knowledge of, or recklessly disregarded, the plan and scheme by which the Robinhood routed orders for the purpose of extracting payment for order flow, despite this practice uniformly failing to satisfy Defendants' duty of best execution.

130.    Plaintiff and the Class placed orders through Robinhood with the reasonable expectation of receiving best execution throughout the Class Period.

131.    Without knowledge that Defendants were knowingly failing to satisfy their duty of best execution, which was concealed and misrepresented by Defendants through numerous platforms, Plaintiff and the Class placed orders through Robinhood, in reasonable reliance on the materially false and misleading statements and omissions, causing economic injury and damages.

132.    Defendants' device, scheme, and/or artifice to defraud had a uniform effect on Plaintiff and the Class, in that the diversion of order flow to principal trading firms who agreed to satisfy Defendants' substantial demand for payment for order flow caused uniformly inferior execution quality, including lost opportunities for price improvement, compared to the prices available on the market through other firms.

133.    Defendants' device, scheme, and/or artifice to defraud constituted a fraud on the market, in that the price at which each stock is traded was presumably impacted by Defendants' fraudulent information, thus injuring every investor who trades in any particular security.

134.    Through the conduct alleged herein, Defendants have, knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Security Exchange Act and Rule 10b-5(a) promulgated thereunder.

135.    At the time Plaintiff and the Class made orders with Defendants for securities, better prices, including opportunities for price improvement, were available to Plaintiff and the Class on each order, but these prices and/or opportunities for price improvement were not provided by Defendants.

136.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff and the Class have suffered economic damages in connection with Defendants' routing of their orders and failure to satisfy its duty of best execution during the Class Period.

## SECOND CAUSE OF ACTION

### Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b)

137.    Plaintiff includes all preceding factual allegations as if fully set forth herein.

138.    This Count is based upon Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

139.    Rule 10b-5(b) provides that "[i]t shall be unlawful for any person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."

140.    Defendants further have a duty of best execution, by which Defendants, as a dealer-broker, are legally required to seek the best price reasonably available for their customers' orders and through which they knew or should have known of the falsity and or misleading nature of their representation and omissions about payment for order flow and execution quality.

141.    Defendants made numerous untrue statements of facts and omitted material facts necessary to make the statements made not misleading in light of the circumstances under which they were made.

142.    Defendants and their agents, including senior management, participated directly or indirectly in the preparation of public statements and reports, including statements made to Defendants' clients, governmental entities, security analysts, and the media, that were designed to convince the public and general, and Plaintiff and the Class in particular, that Defendants were providing commission-free trading at best execution price to their clients, when Robinhood and their agents knew that it was not.

143.    Such statements and omissions were materially false and misleading with regard to Defendants' order routing practices and the means by which the company was profiting from its clients through undisclosed, but systematic, payments for order flow, which resulted in less price improvement opportunities for Robinhood customers.

144.   Defendants, Defendants' agents, and Defendants' senior management had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended to deceive Plaintiff and the Class. Or, in the alternative, Defendants, Defendants' agents, and Defendants' senior management acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available.

145.   Defendants are liable both directly and indirectly for the wrongs alleged herein. Defendants and Defendants' senior managers were able to, and did, directly or indirectly control the content of the misleading public statements and omissions made by Robinhood.

146.   Through the conduct alleged herein, Defendants have, knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Security Exchange Act and Rule 10b-5(b) promulgated thereunder.

147.   At the time Plaintiff and the Class made orders with Defendants for securities, better prices, including opportunities for price improvement, were available to Plaintiff and the Class on each order, but these prices and/or opportunities for price improvement, were not provided by Defendants.

148.   As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff and the Class have suffered economic damages in connection with Defendants' routing of their orders and failure to satisfy its duty of best execution during the Class Period.

## THIRD CAUSE OF ACTION

### Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(c)

149.   Plaintiff includes all preceding factual allegations as if fully set forth herein.

150.   This Count is based upon Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10b-5(c) promulgated thereunder by the SEC.

151.   Rule 10b-5(c) provides that "[i]t shall be unlawful for any person, directly or indirectly . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . in connection with the purchase or sale of any security."

152.   Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Robinhood's routing of customer orders and any effect that Robinhood's routing procedures

have, or are likely to have, on the execution quality of its clients' orders.

153.    Defendants further have a duty of best execution, by which Defendants, as a dealer-broker, are legally required to seek the best price reasonably available for their customers' orders.

154.    During the Class Period, Defendants engaged in an act, practice, or course of business, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud, deceit, and/or manipulation upon Plaintiff and the Class, uniformly denying its customers best execution and price improvement on customer trades.

155.    Defendants entered into contractual agreements with principal trading firms, in which customer orders were routed only to third party trading firms that agreed to render Robinhood's demanded payment for order flow, despite this knowingly causing Defendants' clients to receive inferior execution rates and fewer opportunities for price improvement.

156.    Robinhood intended to enter into such contractual agreements with its principal trading firms knowing that it would result in worse execution quality and less price improvement opportunities for Robinhood customers.

157.    This act, practice, and/or course of business by Defendants, was intended to, and throughout the Class Period did: (i) deceive Defendants' clients, including Plaintiff and other Class Members; (ii) cause the Class members to engage in a broker-client relationship with Defendants, which they otherwise would not have done; (iii) cause Plaintiff and the Class to make orders which they otherwise would not have placed; and (iv) deprive Plaintiff and the Class of the best execution and opportunities for price improvement of their orders.

158.    Further, Defendants knew that by failing to provide its clients with the best execution of their orders, including lost price improvement, each Plaintiff and Class Member would, and did, incur economic harm arising from executing Plaintiff's trades at prices less favorable than the best price available, including the chance to obtain a better price than the NBBO.

159.    Defendants and Defendants' senior management had actual knowledge of, or recklessly disregarded, the act, practice, or course of business by which the Robinhood routed orders for the purpose of extracting payment for order flow, despite this practice uniformly failing to satisfy Defendants' duty of best execution.

160.     As a result of Defendants' act, practice, and course of business, Plaintiff and the Class placed orders through Robinhood with the reasonable expectation of receiving best execution throughout the Class Period.

161.     Without knowledge that Defendants were knowingly failing to satisfy their duty of best execution, which was concealed and misrepresented by Defendants through numerous platforms, Plaintiff and the Class placed orders through Robinhood, in reasonable reliance on the materially false and misleading statements and omissions, causing economic injury and damages.

162.     Defendants' act, practice, and course of business constituted a fraud and deceit on Robinhood customers, in that the price at which each stock is traded was presumably impacted by Defendants' fraudulent acts, practices, and course of business, thus injuring every investor who trades in any particular security.

163.     Through the conduct alleged herein, Defendants have, knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Security Exchange Act and Rule 10b-5(c) promulgated thereunder.

164.     At the time Plaintiff and the Class made orders with Defendants for securities, better prices, including opportunities for price improvement, were available to Plaintiff and the Class on each order, but these prices and/or opportunities for price improvement were not provided by Defendants.

165.     As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff and the Class have suffered economic damages in connection with Defendants' routing of their orders and failure to satisfy its duty of best execution during the Class Period.

## **<u>REQUEST FOR RELIEF</u>**

WHEREFORE, Plaintiff, on behalf of himself and the class of similarly situated individuals, requests the Court to:

(a)     Certify the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designate Plaintiff as representative of the class and designate counsel of record as class counsel;

(b)     Order Defendants to provide actual damages and equitable monetary relief (including restitution) to Plaintiff and class members and/or order Defendants to disgorge profits they realized as a

1  result of their unlawful conduct;

2       (c)     Order Defendants to pay punitive damages, as allowable by law, to Plaintiff and class

3  members;

4       (d)     Declare Defendants' conduct unlawful and enter an order enjoining Defendants from

5  continuing to engage in the conduct alleged herein;

6       (e)     For both pre and post-judgment interest at the maximum allowable rate on any amounts

7  awarded;

8       (f)     For costs of the proceedings herein;

9       (g)     For reasonable attorneys' fees as allowed by law; and

10       (h)     Award such other relief as the Court deems appropriate under the circumstances.

11  <u>**JURY DEMAND**</u>

12       Plaintiff, on behalf of himself and the Class of all others similarly situated, hereby demands a

13  trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

14

15  Dated:  March 8, 2022          Respectfully submitted,

16            **AHDOOT & WOLFSON, PC**

17
     */s/ Robert Ahdoot*

18  Tina Wolfson (SBN 174806)
     Robert Ahdoot (SBN 172098)

19  Bradley K. King (SBN 274399)
     2600 West Olive Avenue, Suite 500

20  Burbank, California 91505
     Tel: (310) 474-9111

21  Fax: (310) 474-8585
     twolfson@ahdootwolfson.com

22  rahdoot@ahdootwolfson.com
     bking@ahdootwolfson.com

23
24  **BURSOR & FISHER, P.A.**
     Scott A. Bursor (SBN 276006)

25  Sarah N. Westcot (SBN 264916)
     701 Brickell Ave, Suite 1420

26  Miami, FL 33131
     Telephone: (305) 330-5512
     Facsimile: (305) 679-9006

27  scott@bursor.com
     swestcot@bursor.com

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LIDDLE SHEETS COULSON P.C.**
Nicholas A. Coulson (admitted *pro hac vice*)
Matthew Z. Robb (admitted *pro hac vice*)
975 E. Jefferson Ave.
Detroit, Michigan 48207
Tel: 313-392-0015
Fax: 313-392-0025
ncoulson@lsccounsel.com
mrobb@lsccounsel.com

*Plaintiff's Co-Lead Counsel*

SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND
Case No. 4:20-cv-9328-YGR