Karen P. Kimmey (State Bar No. 173284)
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
kkimmey@fbm.com

Maeve L. O'Connor (appearance pro hac vice)
Elliot Greenfield (appearance pro hac vice)
Brandon Fetzer (appearance pro hac vice)
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
mloconnor@debevoise.com
egreenfield@debevoise.com
bfetzer@debevoise.com

Attorneys for Defendants
ROBINHOOD MARKETS, INC.;
ROBINHOOD FINANCIAL LLC;
ROBINHOOD SECURITIES, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE ROBINHOOD ORDER FLOW LITIGATION | Master File 4:20-cv-09328-YGR |
| | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SECOND CONSOLIDATED AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | Date: May 17, 2022 |
| | Time: 2:00 p.m. |
| | Judge: Hon. Yvonne Gonzalez Rogers |
| | Ctrm: 1, 4th Floor |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ...................................................................................1

STATEMENT OF RELIEF SOUGHT ...................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................................2

STATEMENT OF ISSUES TO BE DECIDED.......................................................................2

PRELIMINARY STATEMENT .............................................................................................2

STATEMENT OF FACTS.......................................................................................................5

I.      THE PARTIES...........................................................................................................5

II.     PAYMENT FOR ORDER FLOW.............................................................................5

III.    THE DUTY OF BEST EXECUTION. .....................................................................6

IV.     ROBINHOOD'S COMPLIANCE WITH THE DUTY OF BEST EXECUTION. ..............7

V.      ROBINHOOD'S STATEMENTS ABOUT PAYMENT FOR ORDER FLOW
        AND EXECUTION QUALITY.................................................................................8

        A.      Payment for Order Flow.................................................................................8

        B.      Execution Quality.........................................................................................10

ARGUMENT ........................................................................................................................10

I.      PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b) AND RULE
        10b-5(b)....................................................................................................................10

        A.      Plaintiff Fails to Plead an Actionable Misstatement or Omission. ..........................11

                1.      Robinhood Did Not Misrepresent the Commission-Free Nature of
                        Its Trading Platform. ...................................................................................11

                2.      Robinhood's Limited Comparison of Two Execution Quality
                        Metrics to Other Brokerages Was Not False or Misleading. .....................12

                3.      Robinhood Repeatedly Disclosed Its Receipt of Payment for Order
                        Flow as a Revenue Source. .........................................................................13

                4.      The Alleged Omission of Information Regarding Robinhood's
                        "Unique Business Model" Is Not Actionable. ............................................15

        B.      Plaintiff Fails to Plead Scienter. ................................................................16

                1.      Plaintiff's Generalized Allegations Are Insufficient................................17

                2.      The Opposing Inference of Nonfraudulent Intent Is Far More
                        Compelling. .................................................................................................19

        C.      Plaintiff Fails to Plead Reliance. ................................................................19

II.     PLAINTIFF FAILS TO STATE A CLAIM UNDER RULE 10b-5(a) OR 10b-5(c). .........21

III.    DISMISSAL WITH PREJUDICE IS WARRANTED. ...........................................23

CONCLUSION ....................................................................................................................24

1

## **<u>TABLE OF AUTHORITIES</u>**

2

CASES

3

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972) ................................................................................*passim*

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ................................................................................*passim*

*Binder v. Gillespie*,
   184 F.3d 1059 (9th Cir. 1999) ............................................................ 20

*Bodri v. GoPro, Inc.*,
   252 F. Supp. 3d 912 (N.D. Cal. 2017) ............................................... 12

*Crago v. Charles Schwab & Co.*,
   2021 WL 4990234 (N.D. Cal. Oct. 27, 2021) ............................... 20, 21

*Desai v. Deutsche Bank Sec. Ltd.*,
   573 F.3d 931 (9th Cir. 2009) ............................................................... 23

*Destfino v. Reiswig*,
   630 F.3d 952 (9th Cir. 2011) ............................................................... 23

*Fleming v. Charles Schwab Corp.*,
   878 F.3d 1146 (9th Cir. 2017) ............................................................. 6

*George v. Cal. Infrastructure & Econ. Dev. Bank*,
   2010 WL 2383520 (E.D. Cal. June 10, 2010) .................................. 21

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
   141 S. Ct. 1951 (2021) ......................................................................... 20

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
   189 F.3d 971 (9th Cir. 1999) ............................................................... 15

*In re Kalobios Pharms., Inc. Sec. Litig.*,
   258 F. Supp. 3d 999 (N.D. Cal. 2017) ............................................... 15

*In re Nektar Therapeutics*,
   2020 WL 3962004 (N.D. Cal. July 13, 2020) ................................... 22

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ............................................................... 10

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012) ................................................ 22

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS.' NOTICE OF MOTION, MOTION, AND
MPA ISO MOTION TO DISMISS SAC - Master File
4:20-cv-09328-YGR

ii

39849\14710881.1

*In re Twitter, Inc. Sec. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020) ................................................................. 10, 16, 17

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
    382 F. Supp. 2d 1173 (N.D. Cal. 2004) ......................................................................... 21

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020) ............................................................................................ 17

*Jui-Yang Hong v. Extreme Networks, Inc.*,
    2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ............................................................... 18

*Kaplan v. Charlier*,
    426 F. App'x 547 (9th Cir. 2011) .................................................................................. 17

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
    940 F.2d 397 (9th Cir. 1991) ........................................................................................ 22

*Lim v. Charles Schwab & Co., Inc.*,
    2015 WL 7996475 (N.D. Cal. Dec. 7, 2015) ................................................................... 6

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ...................................................................................... 17

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006) .......................................................................................... 5

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ......................................................................................................... 16

*McGovney v. Aerohive Networks, Inc.*,
    2019 WL 8137143 (N.D. Cal. Aug. 7, 2019) ................................................................. 13

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...................................................................................... 10

*Neubronner v. Milken*,
    6 F.3d 666 (9th Cir. 1993) ............................................................................................ 23

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001) ..................................................................................... 6, 20

*Real Est. Exch. Inc. v. Zillow Inc.*,
    2021 WL 2352043 (W.D. Wash. June 9, 2021) ............................................................. 13

*Rucker v. Cal.*,
    112 F.3d 517 (9th Cir. 1995) ........................................................................................ 23

*Sanchez v. IXYS Corp.*,
    2018 WL 4787070 (N.D. Cal. Oct. 2, 2018) ................................................................. 15

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) .................................................................................................. 18

*Schwab v. E\*Trade Fin. Corp.*,
   285 F. Supp. 3d 745 (S.D.N.Y. 2018) ................................................... 18, 20, 21

Sprewell v. Golden State Warriors,
   266 F.3d 979 (9th Cir. 2001) ................................................................................. 10

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
   552 U.S. 148 (2008) ......................................................................................... 10, 23

*Tadros v. Celladon Corp.*,
   738 F. App'x 448 (9th Cir. 2018) ......................................................................... 15

*Taylor v. Westor Cap. Grp.*,
   943 F. Supp. 2d 397 (S.D.N.Y. 2013) .................................................................. 22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ......................................................................................... 16, 19

*U.S. ex rel. Perry v. Pac. Mar. Indus. Corp.*,
   2015 WL 4401748 (S.D. Cal. July 17, 2015) ..................................................... 22

*Webb v. SolarCity Corp.*,
   884 F.3d 844 (9th Cir. 2018) ................................................................................. 18

*Wozniak v. Align Tech., Inc.*,
   850 F. Supp. 2d 1029 (N.D. Cal. 2012) ............................................................... 17

*Xiaojiao Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) ........................................................ 13, 16

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ......................................................................... 16, 17

**STATUTES**

15 U.S.C. § 78j(b) ............................................................................................... 10, 22

15 U.S.C. § 78u-4 ................................................................................................. 1, 16

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5 ......................................................................................... 10, 22

17 C.F.R. § 242.606 ................................................................................................. 5-6

Disclosure of Order Execution and Routing Practices,
   Exchange Act Release No. 34-43590, 2000 WL 1721163 (Nov. 17, 2000) ........... 7

FINRA Rule 5310 ..................................................................................................... 6

Order Execution Obligations,
     Exchange Act Release No. 37619A, 1996 WL 506154 (Sept. 6, 1996) ................................. 7

Payment for Order Flow,
     Exchange Act Release No. 34-33026, 1993 WL 403286 (Oct. 6, 1993) ................................. 7

Proposed Amendments to Rule 610 of Regulation NMS,
     Exchange Act Release No. 34-61902, 2010 WL 1500563 (Apr. 14, 2010) .............................. 7

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 17, 2022, at 2:00 p.m., or as soon thereafter as this matter may be heard, in Courtroom 1, Fourth Floor, of the United States Courthouse, 1301 Clay Street, Oakland, CA 94612, before the Honorable Yvonne Gonzalez Rogers, United States District Judge, Defendants Robinhood Financial LLC ("Robinhood Financial"), Robinhood Markets, Inc. ("Robinhood Markets"), and Robinhood Securities, LLC ("Robinhood Securities") (collectively, "Robinhood" or "Defendants") shall and hereby do move the Court to dismiss the Second Consolidated Amended Complaint ("SAC") filed by Lead Plaintiff Ji Kwon ("Plaintiff") without leave to amend pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  Defendants' motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities and all pleadings and papers filed in this matter and upon such other matters as may be presented to the Court at the time of hearing or otherwise.

## STATEMENT OF RELIEF SOUGHT

Robinhood seeks an order dismissing the SAC in its entirety with prejudice.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

Defendants submit this memorandum in support of their motion to dismiss the SAC for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the PSLRA.

<u>**STATEMENT OF ISSUES TO BE DECIDED**</u>

Whether the SAC should be dismissed for failure to state a claim under Section 10(b) of the Securities Exchange Act of 1934.

**PRELIMINARY STATEMENT**

Plaintiff has submitted essentially the same allegations that the Court already held were insufficient to plead an actionable misstatement or omission.  (Dkt. No. 91.)  The handful of new paragraphs in the SAC consist of rhetoric and attorney argument but include no new *facts*: no new alleged misrepresentations and no new facts showing that any statement was false or misleading.  Nor does Plaintiff make any attempt to address the fundamental deficiencies that Defendants identified with respect to the pleading of scienter and reliance.  Plaintiff's claim chart – which is virtually unchanged aside from some formatting differences – leaves no doubt that Plaintiff continues to fall far short of stating a claim for securities fraud.  (Dkt. No. 98.)  The chart largely fails even to point to a specific statement or omission, fails to identify any factual allegations indicating that a statement was false or misleading, and fails to identify particularized factual allegations giving rise to a strong inference of scienter as to any alleged misrepresentation.  Claims about unspecified "Robinhood personnel" and allusions to "internal analyses" do not satisfy Rule 9(b) or the PSLRA.

Robinhood is a broker-dealer that offers retail customers the ability to invest, commission-free, through a self-directed trading platform.[1]  Customers place trades through Robinhood's website or smartphone application, which are then routed to other broker-dealers, known as market makers, for execution.  Robinhood receives payment from these other firms in exchange

---

[1]    Robinhood Markets, the parent of Robinhood Financial and Robinhood Securities, is not a broker-dealer.  Robinhood Financial serves as an introducing broker while Robinhood Securities serves as a clearing broker.  (SAC ¶ 21.)

for routing orders to them – a legal, regulated, and common practice throughout the investment industry known as "payment for order flow."  This suit is a misguided attempt to turn this unremarkable payment stream into a violation of the federal securities laws by alleging, despite extensive disclosures, that Robinhood failed to disclose it, and by asserting, without any particularized supporting allegations, the existence of an ill-defined "scheme."

The thrust of the SAC, like the prior complaint, is that Robinhood's order routing practices and receipt of payment for order flow violated the "duty of best execution," which requires broker-dealers to seek the most favorable execution terms reasonably available under the circumstances. Plaintiff's theory is that, unbeknownst to customers, Robinhood negotiated higher payment for order flow rates than other retail broker-dealers, which allegedly caused customers to receive inferior trade execution prices compared to what they might have obtained from Robinhood's competitors.  Plaintiff's vain attempt to cram its best-execution theory into a securities fraud paradigm is the central flaw of the SAC, which should be dismissed in its entirety – this time with prejudice.

*First*, Plaintiff's Rule 10b-5(b) claim should be dismissed because he does not allege any of its core elements:  an actionable misstatement or omission, particularized facts giving rise to a strong inference of scienter, or reliance.

None of the alleged misrepresentations or omissions identified in the SAC are actionable. Robinhood's description of its platform as commission-free is true, and Robinhood's statement comparing its execution quality to that of other broker-dealers is not actionable because it was limited to two metrics, the veracity of which are undisputed.  Plaintiff's claim that Robinhood misrepresented its sources of revenue also is meritless because Plaintiff admits that payment for order flow was disclosed on Robinhood's website as a source of revenue throughout the class period.  Plaintiff complains only about *where* on Robinhood's website payment for order flow was disclosed, not *whether* it was disclosed.  Furthermore, Robinhood's customer agreement has a section devoted to payment for order flow, and Plaintiff received thousands of trade confirmations stating that Robinhood could receive payment for order flow in connection with his trades.  None of the alleged omissions are actionable because Robinhood did not have an independent duty to

1  disclose the information that was allegedly omitted, and Plaintiff still fails to identify any

2  statement rendered misleading by an omission.

3        Plaintiff fails to allege particularized facts giving rise to a "strong inference" of scienter as

4  required by the PSLRA – *i.e.*, that Defendants knowingly made false statements or acted with

5  reckless disregard for the truth – because Robinhood's alleged motive to obtain payment for order

6  flow is the type of generic profit motive that is insufficient to establish scienter.  Although

7  Plaintiff alleges broadly that "senior Robinhood personnel" were aware of internal analyses

8  showing that Robinhood's execution quality lagged behind other brokerages, Plaintiff fails to

9  identify those "personnel" or offer any particularized facts about the alleged analyses.  Plaintiff's

10  allegations suggest – at worst – mismanagement, which is insufficient to state a claim for fraud.

11        Plaintiff fails to plead reliance because he does not allege that he knew of, or read, any of

12  the allegedly false statements giving rise to this action.  Significantly, despite claiming that he

13  would have used a different brokerage had he known that Robinhood received payment for order

14  flow, Plaintiff continued to use Robinhood's platform after payment for order flow was

15  specifically identified as a source of revenue in an FAQ on Robinhood's website – the very place

16  Plaintiff claims it should have been disclosed all along.  Nor does the SAC provide any basis for

17  the application of a presumption of reliance.  The *Basic* (or "fraud-on-the-market") presumption is

18  inapplicable because Robinhood's alleged failure to get the best execution price for its customers

19  cannot have impacted the underlying price of securities traded on the public markets.  The

20  *Affiliated Ute* presumption, which applies to omissions cases, cannot be invoked here because, as

21  Plaintiff has conceded, the "heart" of this case is an affirmative misrepresentation.

22       *Second*, Plaintiff's claims under Rules 10b-5(a) and 10b-5(c) that Robinhood engaged in a

23  "scheme" to mislead customers about its receipt of payment for order flow and compliance with

24  the duty of best execution are entirely conclusory and unsupported by factual allegations

25  evidencing the existence of the purported scheme.  Plaintiff's attempt to allege scienter and

26  reliance in connection with this supposed scheme is also deficient for the reasons discussed above.

27  Furthermore, the Supreme Court and Ninth Circuit have held that securities plaintiffs cannot rely

28  on a presumption of reliance where, as here, the alleged fraudulent scheme was not disclosed to

the public and the claims also involve alleged misrepresentations.

**STATEMENT OF FACTS**[2]

**I.      THE PARTIES.**

Robinhood offers customers the ability to invest, commission-free, in stocks, ETFs, and options through a self-directed trading platform, both on its website and through a smartphone application.  (SAC ¶ 21.)  Robinhood Financial is a registered broker-dealer with the Securities and Exchange Commission ("SEC").  (SAC ¶ 21.)  It acts as an introducing broker and has a clearing arrangement with Robinhood Securities.  (SAC ¶ 21.)  When customers open accounts with Robinhood, they enter into a customer agreement with Robinhood Financial and Robinhood Securities.  (SAC ¶ 21.)  Plaintiff's only allegation about Robinhood Markets is that it is a Delaware corporation with its principal place of business in California.  (SAC ¶ 20.)

**II.     PAYMENT FOR ORDER FLOW.**

Rather than sending customer orders to buy or sell securities directly to national exchanges like the New York Stock Exchange, Robinhood, like other retail broker-dealers, routes orders to other broker-dealers (known as "principal trading firms" or "electronic market makers") to either execute those orders or route them to other market centers for execution.  (SAC ¶ 24.)  These market makers profit from executing large volumes of retail buy and sell orders, either by taking the other side of customer orders and exiting the positions at a profit or by routing the orders to other market centers.  (SAC ¶ 25.)  To secure a guaranteed supply of liquidity in their markets, market makers offer payments to retail broker-dealers in exchange for the retail firms routing their customers' orders to the market makers.  (SAC ¶¶ 26-27.)  These payments are known as "payment for order flow" or "PFOF."  (SAC ¶ 27.)  SEC rules expressly permit the receipt of such

---

[2]      Allegations from the SAC are assumed to be true for purposes of this motion, except where those allegations contradict the contents of regulatory filings and other documents cited in the SAC.  *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) ("The court may treat . . . a document [referenced in the complaint] as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).").  As discussed further in the Request for Judicial Notice, Defendants request that the Court take judicial notice of the documents attached as exhibits to the accompanying Declaration of Brandon Fetzer, which are referred to herein as "Exs. A-T."

1   payments as long as they are disclosed in quarterly reports filed pursuant to 17 C.F.R. § 242.606

2   ("Rule 606"). (SAC ¶ 29.)[3] There is no allegation that Robinhood failed to fully and accurately

3   report its PFOF in its Rule 606 filings, which Plaintiff acknowledges are posted on Robinhood's

4   website. (SAC ¶ 72.)

5        Principal trading firms may also offer retail broker-dealers "price improvement" on

6   customer executions in exchange for routing customer orders to them. (SAC ¶ 30.) Price

7   improvement occurs when a customer order executes at a price that is superior to the best available

8   quotation then appearing on the public quotation feed, known as the National Best Bid and Offer

9   ("NBBO"). (SAC ¶¶ 30-31.) In these circumstances, the principal trading firm executes a buy

10  order at a price lower than the lowest prevailing offer or executes a sell order at a price higher than

11  the highest prevailing bid. (SAC ¶ 30.)

12  **III.    THE DUTY OF BEST EXECUTION.**

13       A broker-dealer has a duty to seek to obtain best execution of customer orders at the most

14  favorable terms reasonably available under the circumstances. *See Newton v. Merrill Lynch,*

15  *Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 173 (3d Cir. 2001). In other words, the duty "requires

16  brokers to use reasonable diligence to ascertain the trading venue that will secure the most

17  favorable price possible for the customer." *Lim v. Charles Schwab & Co., Inc.*, 2015 WL

18  7996475, at *1 (N.D. Cal. Dec. 7, 2015), *aff'd sub nom. Fleming v. Charles Schwab Corp.*, 878

19  F.3d 1146 (9th Cir. 2017). Determining what prices are reasonably available "in any particular

20  situation may require a factual inquiry into all of the surrounding circumstances." *Newton*, 259

21  F.3d at 187 (internal quotations omitted). FINRA Rule 5310 directs broker-dealers to consider

22  multiple factors, including the "character of the market for the security" and the "size and type of

23

24  _____

    [3]    Rule 606 of Regulation NMS requires broker-dealers to make publicly available quarterly
    reports that disclose, among other things, "the identity of the top ten venues to which they routed
25  orders for execution and the material aspects of their relationship with each of those venues,
    including any arrangement for payment for order flow or profit sharing." Sec. & Exch. Comm'n,
26  Div. of Trading & Markets, Certain Issues Affecting Customers in the Current Equity Market
    Structure (Jan. 26, 2016), at 8. Its counterpart, Rule 607 of Regulation NMS, requires broker-
27  dealers to make certain disclosures to customers upon the opening of a new account and annually
    thereafter, including their policies about PFOF. *See id.*
28

1   transaction."

2       A broker-dealer is required to evaluate the quality of executions it obtains for its

3   customers' orders, consider the best reasonably available terms from competing market centers,

4   and where material differences exist between the price improvement opportunities offered by

5   market centers, take those differences into account in deciding where to route orders.[4]  At the same

6   time, brokers are not held "to an absolute requirement of achieving the most favorable price" on

7   an order or to achieve a certain level of execution quality,[5] nor are they required to match the

8   execution quality metrics of other broker-dealers.  Importantly, "a broker-dealer does not violate

9   its best execution obligation solely because it receives payment for order flow."[6]

10  ## IV.    ROBINHOOD'S COMPLIANCE WITH THE DUTY OF BEST EXECUTION.

11      Robinhood initially relied on another broker-dealer to provide both clearing and order

12  execution, but started routing customer orders directly to principal trading firms in the first half of

13  2016.  (SAC ¶¶ 55-56.)  Robinhood allegedly negotiated a PFOF rate with these trading firms that

14  was higher than the rate the firms paid to other retail brokerages.  (SAC ¶¶ 57-60.)  After allegedly

15  being informed that PFOF might result in less price improvement for customers, Robinhood

16  formed a "Best Execution Committee" to monitor the speed and the prices at which the principal

17  trading firms were executing Robinhood customer orders.  (SAC ¶ 64.)  That committee then met

18  at least once per month.  (SAC ¶ 64.)

19      In 2017, after the committee allegedly first observed that Robinhood was not obtaining

20  much price improvement on its customer orders in equity securities, Robinhood developed a

21  proprietary routing algorithm, known as a smart order router, designed to make the principal

22

23  [4]    Order Execution Obligations, Exchange Act Release No. 37619A, 1996 WL 506154, at
24  *51-53 (Sept. 6, 1996).
    [5]    *See* Payment for Order Flow, Exchange Act Release No. 34-33026, 1993 WL 403286, at
25  *4 (Oct. 6, 1993) (internal citation and quotation marks omitted).
    [6]    Disclosure of Order Execution and Routing Practices, Exchange Act Release No. 34-
26  43590, 2000 WL 1721163, at *12 (Nov. 17, 2000); *see also* Proposed Amendments to Rule 610 of
    Regulation NMS, Exchange Act Release No. 34-61902, 2010 WL 1500563, at *16 (Apr. 14,
27  2010) (noting that PFOF is "not necessarily inconsistent with a broker's duty of best execution, so
28  long as appropriate measures are taken to ensure that that duty is, in fact, met").

trading firms with which Robinhood had payment for order flow arrangements compete for order flow by routing customer orders to the principal trading firm that had provided the most price improvement for that stock over the prior 30 days.  (SAC ¶ 66.)  In October 2018, unspecified "Robinhood personnel" began reviewing Robinhood's order execution quality compared to that of its competitors.  (SAC ¶ 72.)  By March 2019, upon learning that its execution quality was allegedly not on par with its competitors, Robinhood conducted an extensive internal analysis to identify the source of such discrepancies.  (SAC ¶ 73.)

## V.   ROBINHOOD'S STATEMENTS ABOUT PAYMENT FOR ORDER FLOW AND EXECUTION QUALITY.

### A.   Payment for Order Flow.

Robinhood consistently disclosed its receipt of PFOF on its website.  In 2014, before its launch, Robinhood published an FAQ that disclosed that it anticipated receiving PFOF in response to the question, "How does Robinhood make money?"  (SAC ¶ 47.)  In December 2014, the reference to PFOF was moved to a new FAQ, which was deleted sometime in 2016.  (SAC ¶ 75.)  In October 2018, PFOF was again added to the list of revenue sources appearing on the "How Robinhood Makes Money" FAQ.  (SAC ¶ 86.)  Throughout this time, Robinhood disclosed its receipt of PFOF in its Rule 606 reports, which were published on its website and specifically listed the venues to which Robinhood routed orders and the payments Robinhood received in return.  (SAC ¶ 83.)  For example, Robinhood Financial's Q1 2018 Rule 606 report disclosed that "Robinhood received payment from Wolverine Securities, LLC for directing order flow to this venue" and that the payments "averaged less than $0.00026 per dollar of executed trade value." (Ex. A at 3.)

In addition to its website, Robinhood disclosed its receipt of PFOF in its customer agreements and trade confirmations.  (SAC ¶ 85.)  Robinhood's customer agreements have always included a paragraph titled "Equity Orders and Payment for Order Flow," which disclosed PFOF as a potential source of revenue.  (*Id.*)  In relevant part, this paragraph stated:

> 'Payment for order flow' includes, among other things, any monetary payment, service, property, or other benefit that results in remuneration, compensation, or consideration to a broker-dealer from any broker-dealer in return for directing

1   orders.  [Robinhood] transmit[s] customer orders for execution to various
    exchanges or market centers based on a number of factors . . . [that] are designed to
2   result in favorable transaction processing for customers.  The nature and source of
    any payments and/or credits received by [Robinhood] in connection with any
3   specific transactions will be furnished upon written request.

4   (Ex. B § 24.)

5         Furthermore, since Robinhood's inception, trade confirmations sent to customers have

6   disclosed Robinhood's receipt of PFOF.  From the beginning of the class period through

7   November 2018, Robinhood utilized Apex Clearing Corporation ("Apex") as its clearing broker

8   and the Apex trade confirmations stated:

9         Apex receives remuneration for directing orders to particular broker/dealers or
          market centers for execution.  Such remuneration is considered compensation to the
10        firm.  The source and nature in connection with your transaction may be disclosed
          upon written request.  Your Introducing Broker, that clears trades through Apex,
11        may share in such payments or may directly receive payment for order flow for
          certain transactions.  Details may be furnished upon written request.

12

13  (Ex. C.)  From November 2018 (when Robinhood began self-clearing) through the end of the class

14  period, Robinhood's trade confirmations stated:

15        RHS may receive remuneration for directing orders to particular broker-dealers or
          market centers for execution.  Such remuneration is considered compensation to the
16        firm.  The source and nature in connection with your transactions are available
          upon written request.  RHF, when clearing through RHS, may share i[n] such
17        payments or may directly receive payment for order flow for certain transactions.
          Details are available upon written request.

18

19  (Ex. D.)

20        Robinhood's receipt of PFOF as a source of revenue was repeatedly referenced in

21  numerous publications since its founding, including in *The New York Times* and CNBC.  A few

22  examples include:

23        • "In addition to cash balances, the company makes money from 'payment for order
            flow,' which refers to the money it receives for selling its orders to market makers
24          to be executed" (Ex. E);

25        • "Among competitors, Robinhood offers a unique business model.  The company
            gives away free trades of both stocks and cryptocurrencies to its customers, taking
26          a loss on transaction fees.  The app then collects interest on escrowed cash and
            sells trades to market makers" (Ex. F); and

27

28        • "The company generates revenue by taking a tiny fraction of a cent per dollar
            from each trade order as well as collecting interest on customer deposits" (Ex. G).

**B.     Execution Quality.**

In October 2018, Robinhood added an FAQ to its website concerning its order execution quality.  Under the heading, "What is the execution quality for orders on Robinhood," the FAQ stated:

> Reg NMS ensures your order gets executed at the national best bid and offer, or better, at the time of execution.  Our execution quality and speed matches or beats what's found at other major brokerages.  Even when measured at the time of routing, our customers' orders get executed at the NBBO or better.  By way of example, in August 2018, 99.12% of our customers' marketable orders were executed at the the [sic] national best bid and offer or better with an execution speed of 0.08 seconds from routing to execution (for S&P 500 stocks, during market hours).

(SAC ¶ 87.)  This statement was removed from the website in June 2019.  (SAC ¶ 94.)

## ARGUMENT

**I.     PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 10(b) AND RULE 10b-5(b).**

Plaintiff's Section 10(b) and Rule 10b-5(b) claim should be dismissed because he fails to plead with particularity (*i*) an actionable misstatement or omission, (*ii*) facts giving rise to a strong inference of scienter, and (*iii*) reliance.  *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).

Rule 9(b) and the PSLRA impose "heightened pleading requirements" that securities fraud plaintiffs must meet to survive a motion to dismiss.  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).  Under the PSLRA, Plaintiff must plead "particularized allegations of the circumstances constituting fraud," and "additional specific pleading requirements, including [those] requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter."  *Id.*  As this Court has recognized, these requirements are "'formidable' for a plaintiff seeking to state a proper claim and avoid dismissal."  *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 879 (N.D. Cal. 2020) (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008)).

The Court "need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  "Nor is the court required to accept as true allegations that are merely conclusory,

1    unwarranted deductions of fact, or unreasonable inferences." *Id.*

2        **A.      Plaintiff Fails to Plead an Actionable Misstatement or Omission.**

3        With respect to the prior complaint, the Court correctly concluded that Plaintiff "either

4    failed to point to an actionable omission or misrepresentation or failed to sufficiently allege that

5    the misrepresentations or omissions were false or misleading," and Plaintiff alleges nothing new in

6    the SAC that would warrant a different result.  (Dkt. No. 91.)  As Plaintiff's redline makes clear,

7    the allegations in the SAC are largely unchanged from the prior iteration and, in particular, contain

8    no new alleged misrepresentations or facts demonstrating that any statement was false or

9    misleading.  Plaintiff's claim chart confirms that point, as it is also virtually unchanged.

10       As an initial matter, to the extent Plaintiff's claims are based on instructions allegedly

11   given to customer service representatives about Robinhood's receipt of PFOF and the alleged

12   contents of certain training materials (SAC ¶¶ 81-82), the Court already stated that those

13   allegations are too "generic" to support a securities fraud claim.  (Feb. 15, 2022 Hr'g Tr. at 17-18.)

14   Plaintiff does not add any specifics in the SAC.  The Court also already rejected Plaintiff's

15   reliance on the FAQ stating that Robinhood's receipt of PFOF was "negligible" and "indirect"

16   because it occurred prior to the start of the class period.  (*Id.* at 11:14-16.)

17       **1.      Robinhood Did Not Misrepresent the Commission-Free Nature of Its
             Trading Platform.**

18

19       Plaintiff's Rule 10b-5(b) claim is again premised on the untenable assertion that

20   Robinhood did not live up to its promise to provide commission-free trading.  (SAC ¶ 6.)

21   Robinhood's description of its trading platform as commission-free is not false or misleading

22   because Robinhood does not charge commissions.  Plaintiff's conclusory assertion that receipt of

23   PFOF constituted a "backdoor commission" makes no sense.  (SAC ¶ 110.)  Within the broker-

24   dealer industry, a commission is a fee paid by the customer to the broker simply to accept the

25   order.  Unlike other brokerages, which have historically charged a commission of $5 or more per

26   order *and* received PFOF, Robinhood has never charged customers commissions to place orders

27   on its platform.  (SAC ¶ 91.)  Indeed, Plaintiff does not – and cannot – allege that he was charged

28   a commission to place any trades through Robinhood.  Furthermore, PFOF does not constitute a

1  commission because it is paid by principal trading firms – not customers – in exchange for

2  Robinhood's agreement to route orders to those firms.  (SAC ¶ 28.)

3       **2.    Robinhood's Limited Comparison of Two Execution Quality Metrics to Other Brokerages Was Not False or Misleading.**

4

5       The statement in the FAQ comparing Robinhood's execution quality to other brokerages

6  was not false or misleading because the comparison was limited to the specific metrics discussed,

7  and the SAC again lacks any allegations suggesting that Robinhood did not compare favorably to

8  other brokerages with respect to those metrics.  *See Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912,

9  924 (N.D. Cal. 2017) ("A statement is misleading only if a reasonable investor, reading the

10  statement fairly and in context, would be misled.").

11       In an FAQ that Plaintiff alleges was present on Robinhood's website from October 2018 to

12  June 2019, under the heading, "What is the execution quality for orders on Robinhood,"

13  Robinhood stated:

14       Reg NMS ensures your order gets executed at the national best bid and offer, or better, at the time of execution.  Our execution quality and speed matches or beats

15       what's found at other major brokerages.  Even when measured at the time of routing, our customers' orders get executed at the NBBO or better.  By way of

16       example, in August 2018, 99.12% of our customers' marketable orders were executed at the the [*sic*] national best bid and offer or better with an execution

17       speed of 0.08 seconds from routing to execution (for S&P 500 stocks, during

18       market hours).

19  (SAC ¶ 87.)  This statement says nothing about the amount of price improvement received by

20  customers, and its reference to "execution quality and speed" cannot reasonably be read to extend

21  beyond what is explicitly described:  the percentage of orders executed at or above NBBO and the

22  time from "routing to execution" of orders.  The Court directly asked Plaintiff's counsel, "If I find

23  . . . that there is nothing in that statement that addresses [the] issue of price improvement, can you

24  amend?"  (Feb. 15, 2022 Hr'g Tr. at 7:7-9.)  Although Plaintiff's counsel responded in the

25  affirmative, Plaintiff again fails to allege any statement by Robinhood about price

26  improvement.  (*Id.* at 7:10-12.)

27

28

1

### 3.  Robinhood Repeatedly Disclosed Its Receipt of Payment for Order Flow as a Revenue Source.

2

3  To the extent Plaintiff's claims are based on the alleged failure to disclose the receipt of

4  PFOF in the FAQ describing Robinhood's sources of revenue, such failure cannot serve as the

5  basis for Plaintiff's Section 10(b) claim.  As a threshold matter, the receipt of PFOF does not

6  constitute a violation of the duty of best execution and therefore is disconnected from Plaintiff's

7  alleged economic loss.  Furthermore, as Plaintiff concedes, Robinhood disclosed its receipt of

8  PFOF through various means, including on other parts of its website, in its customer agreement,

9  and in each trade confirmation sent to customers.  *See McGovney v. Aerohive Networks, Inc.*, 2019

10  WL 8137143, at *11 (N.D. Cal. Aug. 7, 2019) (dismissing Section 10(b) claim because the

11  defendant "disclosed exactly" what the plaintiff alleged it had omitted).  Robinhood's receipt of

12  PFOF was also widely reported by various mainstream news sources.

13  *First*, Robinhood disclosed PFOF as a source of revenue on its website.  From December

14  2014 to 2016 and again from September or October 2018 to present, PFOF was listed in an FAQ

15  concerning Robinhood's sources of revenue.  (SAC ¶¶ 51-52, 75, 86.)  Plaintiff also admits that

16  throughout the class period, Robinhood's receipt of PFOF was disclosed in Rule 606 reports –

17  posted on Robinhood's website – which specifically identified the principal trading firms to which

18  Robinhood routed orders and the PFOF Robinhood received in return.  (SAC ¶ 83.)  For example,

19  for the first quarter of 2018, Robinhood identified Apex Clearing Corporation, Citadel Execution

20  Services, Two Sigma Securities, LLC, and Wolverine Securities, LLC as entities to which it

21  routed orders, and for the latter three disclosed that "[p]ayments received averaged less than

22  $0.00026 per dollar of executed trade value for order flow."  (Ex. A at 3.)

23  The fact that these disclosures were made on a different part of Robinhood's website is of

24  no moment because Robinhood's website is properly viewed as a whole.  *See Real Est. Exch. Inc.*

25  *v. Zillow Inc.*, 2021 WL 2352043, at *7 (W.D. Wash. June 9, 2021) (finding that defendant's

26  website, "viewed as a whole rather than the websites' individual parts," was unlikely to mislead);

27  *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal. 2019) (plaintiffs cannot

28  cherry-pick or ignore portions of statements "viewed properly as a whole").

*Second*, Robinhood's customer agreement and trade confirmations disclosed the receipt of PFOF.  (SAC ¶ 85.)  From inception, Robinhood's customer agreement has included a section devoted to PFOF – "Equity Orders and Payment for Order Flow" – that allowed customers to seek information about "the nature and source of any payments and/or credits" received by Robinhood in connection with its order routing practices.  (Ex. B.)  Trade confirmations sent to customers also disclosed PFOF.  From November 2015 to November 2018, the trade confirmations sent to customers by Apex, which cleared trades on behalf of Robinhood, stated that Apex "receives remuneration for directing orders to particular broker/dealers or market centers for execution" and that Robinhood Financial "may share in such payments or may directly receive payment for order flow."  (Ex. C.)  Since December 2018, trade confirmations have included similar language, but substituted Robinhood Securities for Apex.  (Ex. D.)

*Third*, numerous publications have confirmed Robinhood's receipt of PFOF since at least 2013.  For example, in December 2013, *TechCrunch*, a leading technology start-up media outlet stated:  "Robinhood will also earn money from what's called 'payment for order flow.'  Essentially, stock exchanges want lots of stock trading volume so people can always find a buyer or seller, so they're willing to pay a little to get trades executed on their exchange versus another."  (Ex. H.)  Similarly, in a February 2014 interview with CNBC, one of Robinhood's founders stated that "Robinhood has several monetization revenue streams on day one.  Those include margin lending, payment for order flow, and interest on cash balances."[7]  Around that same time, *TechCrunch* again noted that Robinhood planned to receive "payment for order flow where stock exchanges pay the startup to bring its trading volume to their marketplaces."  (Ex. I.)  Press coverage continued through 2014 and 2015.  (*See, e.g.*, Exs. J-K.)  And in April 2016, an article quoted one of Robinhood's founders as saying that Robinhood "receive[s] a small amount per trade from security dealers who buy and sell stocks – known as market makers – to bring customers together."  (Ex. L.)  In February 2017, in connection with an interview with the

---

[7]   *Buy Stocks with $0 Commission*, CNBC (Feb. 27, 2014), https://www.cnbc.com/video/2014/02/27/buy-stocks-with-0-commission.html.

founders, *The New York Times* noted that, "[i]n addition to cash balances, [Robinhood] makes money from 'payment for order flow,' which refers to the money it receives for selling its orders to market makers to be executed."  (Ex. E.)  Robinhood's founders continued to discuss PFOF with various media outlets throughout the spring of 2017, and articles in *The Wall Street Journal*, the *San Francisco Business Times*, *TechCrunch*, and *Reuters* (among many others) published around that time explicitly mention PFOF as a source of Robinhood's revenue.  (Exs. M-P.)

Media reports referring to Robinhood's receipt of PFOF continued throughout 2018, including articles in *The Wall Street Journal* and *Business Insider*.  These articles described PFOF as "selling client trades to market makers" (Ex. Q) and "selling order flow to stock exchanges looking to secure more liquidity for their traders," (Ex. R) and identified PFOF as one of Robinhood's "three main monetization streams" (Ex. S) and "[i]ts other main way of pulling in cash" (Ex. T).

The law is clear that publicly available information "cannot be a material omission under federal securities laws."  *Sanchez v. IXYS Corp.*, 2018 WL 4787070, at *3 (N.D. Cal. Oct. 2, 2018) (dismissing Section 10(b) claim because the analyst reports serving as basis for claim were publicly available on Bloomberg and thus "already included in the total mix of information considered by shareholders"); *see also Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 980-81 (9th Cir. 1999) (no duty to disclose information "that the market was aware of" from news articles); *Tadros v. Celladon Corp.*, 738 F. App'x 448, 448-49 (9th Cir. 2018) (rejecting omission claim where omitted facts were disclosed "in a publicly accessible journal article"); *In re Kalobios Pharms., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1004, 1009-10 (N.D. Cal. 2017) (dismissing Section 10(b) claim where the allegedly omitted facts were reported by "credible and mainstream sources like the New York Times, Forbes and Newsweek").

### 4.   The Alleged Omission of Information Regarding Robinhood's "Unique Business Model" Is Not Actionable.

To the extent Plaintiff's claims are premised on Robinhood's alleged failure to "disclose its unique business model of charging significantly higher PFOF than other brokers," as Plaintiff's claim chart suggests, such an omission is not actionable because Robinhood did not have a duty to

disclose that information.  (Dkt. No. 98 at 1.)  Under the federal securities laws, omissions "are actionable only where they make . . . actual statements misleading; it is not sufficient that an investor merely considered the omitted information significant." *In re Twitter*, 506 F. Supp. 3d at 880 (internal quotations omitted); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44-45 (2011) (Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information."); *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").  Nor does a true statement become "actionable merely because it is incomplete." *In re Twitter*, 506 F. Supp. 3d at 880.  Plaintiff does not contend that Robinhood failed to comply with its disclosure obligations under SEC Rule 606.  Nor does Plaintiff identify any statement that is rendered misleading by the omission of information regarding the amount of PFOF received compared to other broker-dealers or the alleged ratio of PFOF to price improvement.

**B.      Plaintiff Fails to Plead Scienter.**

Plaintiff made no changes to its scienter allegations, which still fall far short of the PSLRA's requirement that he "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A) – *i.e.*, that Defendants "made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (internal quotations omitted).  To qualify as "strong," the inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  Courts are directed to engage in a comparative analysis and "must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Id.*

To plead scienter, therefore, "the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Xiaojiao Lu*, 417 F. Supp. 3d at 1279 (internal quotations omitted).  Pleading "deliberate recklessness" requires specific factual

1    allegations showing "a highly unreasonable omission, involving . . . an extreme departure from the

2    standards of ordinary care, and which presents a danger of misleading buyers or sellers that is

3    either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*

4    *Partners*, 552 F.3d at 991.

5              **1.       Plaintiff's Generalized Allegations Are Insufficient.**

6              Plaintiff's allegations pertaining to scienter are conclusory and fall far short of meeting the

7    PSLRA's heightened pleading standard.  Plaintiff's attempt to establish scienter based on the

8    assertion that "senior Robinhood personnel" and "senior management" were allegedly aware of

9    certain internal analyses suggesting that Robinhood's execution quality lagged behind other

10   brokerages is insufficient to avoid dismissal because the SAC fails to identify the personnel at

11   issue or anything at all about these purported analyses.  (SAC ¶¶ 73, 88, 90, 142, 144.)  *See*

12   *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (generalized allegations about warnings

13   made to "unidentified senior executives" are not "sufficiently particularized to raise a strong

14   inference of scienter against any individual, must less one whose knowledge may be imputed" to

15   the company); *Kaplan v. Charlier*, 426 F. App'x 547, 549 (9th Cir. 2011) (general allegation that

16   "management knew about the problems" insufficient to state a claim because complaint lacked

17   "any facts to back up this conclusory statement"); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027,

18   1035-36 (9th Cir. 2002) (dismissing claim where plaintiffs failed to state the source of information

19   regarding the reports, how they learned of them, who drafted them, or which officers received

20   them); *In re Twitter*, 506 F. Supp. 3d at 888 (allegations concerning "daily summaries" and

21   "periodic reviews of key metrics" insufficient to draw strong inference of scienter because the

22   complaint did not "describe with particularly the specific contents" of those materials); *Wozniak v.*

23   *Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1042 (N.D. Cal. 2012) (concluding that the complaint

24   failed to allege scienter because "[a]lthough plaintiff refer[red] to the existence of sales and

25   shipment data and ma[de] a general assertion about what the data showed, plaintiff allege[d] no

26   hard numbers or other specific information").

27             Plaintiff's allegations about Robinhood's alleged failure to disclose its receipt of payment

28   for order flow and the allegedly higher-than-normal rate of such payments similarly do not

DEFS.' NOTICE OF MOTION, MOTION, AND            17
MPA ISO MOTION TO DISMISS SAC - Master File
4:20-cv-09328-YGR

1   establish a strong inference of scienter.  As a starting point, Plaintiff's claim that Robinhood

2   intentionally or recklessly failed to disclose its receipt of PFOF makes no sense in light of the

3   varied ways in which Robinhood's receipt of PFOF was disclosed, precluding any inference of

4   scienter.  It is also legally insufficient because the "pursuit of PFOF is the type of generic profit

5   motive that is insufficient to establish scienter," *Schwab v. E\*Trade Fin. Corp.*, 285 F. Supp. 3d

6   745, 758 (S.D.N.Y. 2018), *aff'd*, 752 F. App'x 56 (2d Cir. 2018), and Plaintiff appears to be

7   asking for an inference of scienter from the mere fact of an alleged omission, which does not

8   satisfy the PSLRA.

9         Furthermore, the receipt of higher PFOF rates than other brokerages does not support an

10   inference of scienter with regard to execution quality because PFOF does not cause poor execution

11   quality.  (SAC ¶¶ 58-60.)  Order execution is not merely a dynamic between the customer (who

12   receives price improvement) and the broker-dealer (who receives PFOF).  Market makers also

13   play a critical role in the process.  Robinhood receiving less PFOF would not necessarily mean

14   greater price improvement for customers because the market maker could simply choose to keep

15   that additional portion of the spread as profit for itself.  (*See* SAC ¶ 68 (alleging only that "high

16   payment for order flow rates *could* lead to less price improvement") (emphasis added).)

17         Robinhood's alleged failure to conduct regular and rigorous reviews of its compliance with

18   the duty of best execution also is insufficient to establish a strong inference of scienter because

19   those alleged failures suggest at most corporate mismanagement, not fraud.  *Santa Fe Indus., Inc.*

20   *v. Green*, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did not seek to regulate transactions

21   which constitute no more than internal corporate mismanagement."); *Webb v. SolarCity Corp.*,

22   884 F.3d 844, 856 (9th Cir. 2018) (scienter not adequately pleaded where plaintiff's allegations, at

23   best, "paint a picture of a mismanaged organization in need of closer financial oversight"); *Jui-*

24   *Yang Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at \*20 (N.D. Cal. Apr. 27, 2017)

25   (allegation that alleged wrongdoing had a "negative impact on customers" was "insufficient to

26   establish scienter" where it "more properly sounds in corporate mismanagement").

27

28

1    **2.     The Opposing Inference of Nonfraudulent Intent Is Far More**
2    **Compelling.**

3         Not only do Plaintiff's allegations fail to give rise to an inference of scienter that is

4    "cogent" and "compelling," but the "opposing inference of nonfraudulent intent" is far more

5    compelling.  *Tellabs*, 551 U.S. at 314.  Plaintiff's allegations indicate that Robinhood worked over

6    the course of the putative class period to monitor, analyze, and improve the execution quality of its

7    customers' orders.

8         At the start of the putative class period, after allegedly being informed that PFOF might

9    result in less price improvement for customers, Robinhood formed a "Best Execution Committee"

10   to monitor the speed and the prices at which the principal trading firms were executing Robinhood

11   customer orders.  (SAC ¶ 64.)  That committee then met "at least once per month."  (SAC ¶ 64.)

12   In 2017, after the committee allegedly first observed that Robinhood "was not obtaining much

13   price improvement on its customer orders in equity securities," Robinhood "developed a

14   proprietary routing algorithm, known as a smart order router, designed to make the principal

15   trading firms with which Robinhood had payment for order flow arrangements compete for order

16   flow by *routing customer orders to the principal trading firm that had provided the most price*

17   *improvement* for that stock over the prior 30 days."  (SAC ¶ 56 (emphasis added).)  In October

18   2018, "Robinhood personnel" began reviewing Robinhood's order execution quality compared to

19   that of its competitors.  (SAC ¶ 72.)  By March 2019, upon learning that its execution quality was

20   allegedly not on par with its competitors, Robinhood conducted an "extensive internal analysis" to

21   identify the source of such discrepancies.  (SAC ¶ 73.)  Far from suggesting fraud, these

22   allegations portray a growing company making good-faith efforts to monitor and improve

23   execution of trade orders.

24   **C.     Plaintiff Fails to Plead Reliance.**

25        Unlike traditional securities fraud cases where plaintiffs may rest on a presumption that

26   they relied on false or misleading statements under the fraud-on-the-market theory (also known as

27   the *Basic* presumption) or *Affiliated Ute* (available in certain omissions cases), Plaintiff cannot

28

rely on either presumption to establish reliance here.  He must affirmatively allege that he read and relied on the statements allegedly giving rise to this action, which he fails to do.

Plaintiff cannot invoke the *Basic* presumption of reliance because he cannot plausibly allege that any purported misrepresentation by Robinhood about its receipt of PFOF or execution quality impacted the market price of any security.  *See Newton*, 259 F.3d at 175 (holding that the *Basic* presumption is "inappropriate" in a best execution case because the claims "do not involve an omission or misrepresentation that affected the value of a security in an efficient market"); *Schwab*, 285 F. Supp. 3d at 753 (explaining that the fraud-on-the-market presumption applies "where the plaintiff transacted in the stock of a company that made material misrepresentations to the public and whose stock is traded on an efficient market").  No court has ever applied the *Basic* presumption in a best execution case.

As the Supreme Court has explained, the *Basic* presumption "is premised on the theory that investors rely on the market price of a company's security, which in an efficient market incorporates all of the company's public misrepresentations."  *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1957 (2021) (citing *Basic*).  The application of this presumption to a typical securities fraud lawsuit is straightforward:  if a company makes a materially false or misleading public statement about its business and its stock trades in an efficient market, a misstatement is presumed to impact its stock price.  But the *Basic* presumption has no application in a best execution case, where an alleged misrepresentation by a broker-dealer about its execution quality contains no information about any public company and therefore could not possibly impact any company's stock price.  Indeed, the idea that Robinhood's statement about its "execution quality and speed" could impact the stock price of any public corporation – much less the price of all stocks traded on Robinhood's platform – is absurd on its face.

Further, Plaintiff cannot invoke the presumption of reliance created by *Affiliated Ute* because he "allege[s] both misstatements and omissions" and the case cannot be characterized as "one that primarily alleges omissions."  *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999); *see also Crago v. Charles Schwab & Co.*, 2021 WL 4990234, at *3-5 (N.D. Cal. Oct. 27, 2021) (rejecting application of *Affiliated Ute* presumption in best execution case because the plaintiff did

not primarily allege omissions); *George v. Cal. Infrastructure & Econ. Dev. Bank*, 2010 WL

2383520, at *6 (E.D. Cal. June 10, 2010) (declining to apply *Affiliated Ute* presumption in case

alleging both "affirmative misrepresentations and omissions").  Indeed, Plaintiff has explicitly

stated that Robinhood's alleged misstatement regarding "execution quality and speed" is the

"fundamental deception at the heart of this lawsuit," and Plaintiff's claim chart consists

predominantly of alleged misstatements.  (Dkt. No. 72 at 18; Dkt. No. 98.)  Furthermore,

Robinhood's supposed failure to disclose the alleged falsity of its representations about execution

quality and sources of revenue "does not transform a misrepresentation case into an omission case

and allow a plaintiff to seek refuge in the *Affiliated Ute* presumption."  *Schwab*, 285 F. Supp. 3d at

753; *Crago*, 2021 WL 4990234, at *3 ("If the omissions are effectively the inverse of the

misrepresentations – in that they render the statement alleged to be a misrepresentation untrue – a

case is not primarily an omissions case.").

Without the benefit of these presumptions, Plaintiff had to plead direct reliance on the

misstatements allegedly giving rise to this action, but he has not done so.  *See Schwab*, 285 F.

Supp. 3d at 753 (dismissing claims based on alleged failure to abide by duty of best execution

because the plaintiff failed "to allege that he actually read, or was otherwise aware of,

E*TRADE's representations regarding its best execution methodology"); *In re Van Wagoner

Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173, 1187 (N.D. Cal. 2004) (reliance not pled with

particularity where the plaintiffs made "no specific allegations that they read the annual reports or

registration statements" giving rise to suit).  Moreover, to the extent Plaintiff claims he would

have used a different broker-dealer had he known about Robinhood's receipt of PFOF, that

contention is completely undermined by the fact that Plaintiff continued to use Robinhood's

trading platform even after PFOF was added to Robinhood's source of revenue FAQ in October

2018.  (SAC ¶¶ 86 (alleging PFOF disclosed in FAQ in October 2018), 96 (alleging Plaintiff used

Robinhood to place trades from 2017 through 2019).)

## II.    PLAINTIFF FAILS TO STATE A CLAIM UNDER RULE 10b-5(a) OR 10b-5(c).

Plaintiff's Section 10(b) claims should be dismissed to the extent they are based on

violations of Rules 10b-5(a) or (c) – the "fraudulent scheme" prongs of Rule 10b-5 – because he

fails to allege (*i*) that Robinhood "committed a deceptive or manipulative act in furtherance of the alleged scheme," (*ii*) scienter, and (*iii*) reliance. *In re Nektar Therapeutics*, 2020 WL 3962004, at *13 (N.D. Cal. July 13, 2020); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

Plaintiff's claim that Robinhood engaged in a scheme to mislead customers about the commission-free nature of its trading platform and to obtain PFOF at the expense of price improvement and the duty of best execution is unsupported by any facts. Plaintiff fails to plead with particularity "the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991); *U.S. ex rel. Perry v. Pac. Mar. Indus. Corp.*, 2015 WL 4401748, at *5 (S.D. Cal. July 17, 2015) (rejecting fraud claim under Rule 9(b) where plaintiff did not "allege the identity of the individuals engaged with [the fraudulent acts]," and noting that "general reference to the defendant [is] insufficient to meet the 'who' of the particularity requirement because '[p]leaders alleging fraud are required to identify individuals involved in the fraud'"); *Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 404 (S.D.N.Y. 2013) (dismissing scheme liability claim where the complaint "contain[ed] virtually no details about [the] alleged scheme: it is impossible to tell what manipulative acts were performed, who performed them, when they were performed, what securities were involved, and what effect this scheme had on the market for those securities"). Nowhere in the SAC does Plaintiff identify any of the employees allegedly involved in the scheme or the roles they allegedly played.[8]

Plaintiff fails to allege scienter and reliance for the same reasons as discussed above, in addition to the fact that his scheme liability claims are particularly ill-suited to a presumption of reliance. The *Basic* presumption is inapplicable because Plaintiff cannot plausibly allege that the supposed scheme impacted the market price of any security. *See In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 162 (S.D.N.Y. 2012) (finding that plaintiffs could not invoke the fraud-on-the-market presumption in a scheme liability case where the defendants' "shares

---

[8] Although a scheme to disseminate false or misleading statements may serve as the basis of a claim under Rule 10b-5(a) or (c) in some cases, for the reasons discussed above, Plaintiff has failed to allege an actionable misstatement or omission.

never traded in an efficient market").  Moreover, none of the allegedly fraudulent acts were disclosed to the public, which provides independent grounds to reject the *Basic* presumption. *Stoneridge*, 552 U.S. at 159 (holding that plaintiffs cannot rely on the *Basic* presumption in fraudulent scheme cases because the deceptive acts are not "communicated to the public" and thus there is no fraudulent information "reflected in the market price of the security").  Plaintiff alleges that Robinhood's customers were "unsuspecting," and he admits that he did not know that Robinhood was allegedly failing to abide by its duty of best execution.  (SAC ¶¶ 4, 161.) Likewise, the *Affiliated Ute* presumption is inapplicable in cases such as this, where there are "some omissions, but also misrepresentations and secret manipulation."  *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009).  By their very nature, fraudulent schemes must usually "remain undisclosed to the general public" to succeed and the nondisclosure of that scheme does not turn every Rule 10b-5(a) and (c) claim into an omissions case.  *See Desai*, 573 F.3d at 941.

## III.   DISMISSAL WITH PREJUDICE IS WARRANTED.

The SAC should be dismissed with prejudice in light of Plaintiff's repeated inability to state a claim for securities fraud notwithstanding this Court's "detailed instructions as to what [it] needed to do to fix the problems with the complaint."  *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011) ("The district court's 'decision to dismiss the [second] amended complaint with prejudice was appropriate in light of [plaintiffs'] repeated failure to cure deficiencies in [their] pleadings.'") (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993); *see also Rucker v. Cal.*, 112 F.3d 517, 517 (9th Cir. 1995) (affirming dismissal of second amended complaint where "district court notified [plaintiff] of deficiencies in the first amended complaint and it was clear [defendant] could not cure the deficiencies of his second amended complaint").

The paltry new allegations in the SAC make clear that Plaintiff cannot cure the fundamental deficiencies in his claims.  Plaintiff is completely unable to plead a false or misleading statement, much less allege particularized facts giving rise to a strong inference of scienter or adequately plead reliance.  There is no reason to believe that yet another amendment would lead to a different result.

# **CONCLUSION**

For the reasons set forth herein, the Court should dismiss the SAC in its entirety with prejudice.

Dated:  March 29, 2022                    FARELLA BRAUN + MARTEL LLP


                                          By:   */s/  Karen Kimmey*
                                                Karen Kimmey

                                          Attorneys for Defendants
                                          ROBINHOOD MARKETS, INC.;
                                          ROBINHOOD FINANCIAL LLC;
                                          ROBINHOOD SECURITIES, LLC