1

2
**UNITED STATES DISTRICT COURT**

3
**NORTHERN DISTRICT OF CALIFORNIA**

4

5
Case No.  4:20-cv-9328-YGR

6
IN RE ROBINHOOD ORDER FLOW

7
LITIGATION

**ORDER DENYING MOTION FOR JUDGMENT
ON THE PLEADINGS**

8

9
Dkt. No. 119

10

11
      Plaintiff Ji Kwon brings this second amended class action complaint against defendants

12
Robinhood Financial LLC ("Robinhood Financial"), Robinhood Securities, LLC ("Robinhood

13
Securities"), and Robinhood Markets, Inc. ("Robinhood Markets") (collectively "Robinhood") on

14
behalf of himself and a class of similarly situated individuals, alleging false and misleading

15
statements and omissions and fraudulent and manipulative conduct between September 1, 2016

16
and June 16, 2020 (the "Class Period") (Dkt. No. 93) ("Consolidated Second Amended Class

17
Action Complaint" or "Compl.").  Plaintiff asserts three causes of action, each alleging a violation

18
of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(a), 10b-5(b), and 10b-

19
5(c) respectively.

20
      Having twice considered a motion to dismiss, now before the Court is Robinhood's Motion

21
for Judgment on the Pleadings Dismissing the Second Consolidated Amended Class Action

22
Complaint. (Dkt. No. 119.) After carefully considering the papers submitted and the pleadings in

23
this action, and for the reasons set forth below, the Court hereby **DENIES** the motion for judgment

24
on the pleadings.

25
                                    *****

26
      A court may grant judgment on the pleadings where there are no issues of material fact,

27
and the moving party is entitled to judgment as a matter of law when taking the allegations in the

28
pleadings as true. *Gregg v. Hawaii, Dep't of Pub. Safety, 870 F.3d 883, 887 (9th Cir. 2017)*

United States District Court
Northern District of California

(citation omitted). This standard is "functionally identical" to the standard for determining a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Id.* Accordingly, a court need not accept as true factual allegations that are conclusory or conclusions of law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citation omitted).

*****

Relying on a recent Second Circuit case, *Menora Mivtachip Insurance Ltd. et al. v. Frutarom Industries Ltd., et al.* ("*Menora*"), No. 21-1076, 2022 WL 17332303 (2d Cir. Nov. 30, 2022) to argue that plaintiff lacks standing to pursue a Section 10(b) claim because he does not allege Robinhood make a misstatement about a security purchased or sold by plaintiff.  The Court recently addressed at length its rejection of the Section Circuit's approach to Section 10(b) standing. *In re CCIV/Lucid Motors Securities Litigation*, No. 21-9323 (N.D. Cal. Jan 11, 2023) at Dkt. No. 151.[1] As addressed therein, this Court finds that, as articulated by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores*, 421 US 723 (1975), Section 10(b) standing is limited to purchasers and sellers of securities.  Plaintiff alleges that he suffered tangible damages from securities he purchased and sold on Robinhood's platform. As such, the Court finds that plaintiff satisfies the purchaser-seller rule adopted in *Blue Chip*.

*****

In light of the foregoing, the Court **DENIES** Robinhood's motion for judgment on the pleadings. The Court hereby **SETS** a Case Management Conference for Monday, February 6, 2023, at 2:00 PM.

This order terminates Docket Number 119.

**IT IS SO ORDERED.**

Dated:

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

---

[1] For the parties' convenience, a copy of the Order is included herewith as Attachment A.

# Attachment A

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

Case No.  4:21-cv-09323-YGR

**IN RE CCIV/LUCID MOTORS SECURITIES**

**LITIGATION**

**ORDER GRANTING MOTION TO DISMISS**

Dkt. No. 113

    This action arises from plaintiffs' claims that defendant Lucid Motors ("Lucid") and its
CEO, defendant Peter Rawlinson, induced plaintiffs to buy the stock of a different entity, namely
Churchill Capital Corporation IV ("CCIV"), through misrepresentations and omissions about the
value of Lucid itself.  Additionally, they allege that defendants used a scheme and fraud, in
violation of Section 10(b) of the Security Act of 1934, 15 U.S.C. § 78j(b).  Specifically, they
allege that defendants violated sections (a)-(c) of Section 10(b)'s enacting rule, 17 C.F.R. §
240.10b-5, (referred to herein as "Rule 10-b") and Section 20(a) of the Exchange Act, 15 U.S.C.
§ 78t-1.   Before the Court is defendants' motion to dismiss plaintiffs' Revised Amended
Complaint[1] ("RAC") for lack standing and failure to adequately allege actionable
misrepresentations, materiality, and scienter.[2]  (Dkt. No. 113.)

    For the reasons given herein, the motion is **DENIED** on grounds of standing and **GRANTED**

---

    [1] The complaint was amended by stipulation of the parties and has not been subject to prior
motions practice.  (Dkt. No. 109.)

    [2] The Court **GRANTS** defendants' unopposed request for judicial notice and affords the
noticed documents their proper evidentiary weight.  *See Rejoice! Coffee Co., LLC v. Hartford Fin.
Servs. Grp.*, No. 20-cv-06789-EMC, 2021 U.S. Dist. LEXIS 235263, at *32-33 (N.D. Cal. Dec. 8,
2021) (stating a court may take judicial notice of a public record, but not the facts therein when the
facts are in dispute).

1    on grounds of lack of materiality.

2    **I.      FACTUAL BACKGROUND**

3           For purposes of this Order, the relevant portions of the RAC allege as follows:

4           In April 2020, a Special Purpose Acquisition Company ("SPAC") called Churchill Capital

5    Corporation IV or CCIV was formed in Delaware.  (RAC at ¶ 52.)  CCIV was created by Michael

6    Klein, an experienced SPAC founder.  (*Id.* at ¶ 55.)  A SPAC, is a publicly traded shell company

7    created to merge with an existing privately held business, with the intent of allowing the target

8    business to go public without the time, expense, and regulatory scrutiny, that would be required

9    were the target business to independently go public through an Initial Public Offering ("IPO").

10   CCIV followed the common process for SPACs.  It first raised funds from public investors

11   through an IPO, which it held in trust for the investors.  (*Id.* at ¶¶ 53-56.)  CCIV then sought out

12   an acquisition target (that is, a private company with whom to merge).  After the merger, the

13   interest of investors in CCIV would be converted to common stock in the post-merger company.

14   (*Id.*)  Often, such stock is valued significantly higher than the initial investment.  Because of this,

15   SPACs have in recent years become an increasingly attractive and common investment model.

16   (*Id.* at ¶¶ 54-57.)

17          Lucid was a car manufacturer that intended to compete in the luxury car market.  (*Id.* at

18   ¶ 3.)  It had unveiled the "Air" which it described as the world's most efficient luxury electric

19   sedan and as a favorable competitor with Tesla Motors.  (*Id.*)  While displaying a strong public

20   image, Lucid was suffering financially and behind schedule in developing and producing vehicles.

21   (*Id.* at ¶ 4.)

22          On January 11, 2021, Bloomberg News, not defendants, announced that CCIV was "in

23   talks" with Lucid, an electric car manufacturer.  (*Id.* at ¶ 76.)  In fact, talks between CCIV and

24   Lucid did not start until after publication of the Bloomberg article, albeit they were initiated later

25   that same day.  (*Id.* at ¶ 78.)  The Bloomberg article was widely circulated in the financial press.

26   (*Id.* at ¶ 77.)  CCIV's stock price quickly increased 32%.  (*Id.* at ¶ 6.)  These events indicated to

27   Lucid's CEO, defendant Peter Rawlinson that "he could control, or at least heavily influence,

28   CCIV's behavior through media coverage of Lucid and the potential Merger."  (*Id.* at ¶ 78.)

United States District Court
Northern District of California

On January 12, 2021, CCIV signed a non-disclosure agreement in connection with a potential business combination.[3]  (*Id.* at ¶ 79.)  Additionally, CCIV's founder and CEO, Klein, did an interview with the publication IPO Edge during which *the interviewer stated* that Klein could not comment on the potential acquisition of Lucid because "he is in a difficult position and cannot address that at all."  (*Id.* at ¶ 83; emphasis supplied.)

On January 13, CCIV began formal diligence on Lucid.  (*Id.* at ¶ 79.)  On January 14, CCIV sent a letter of intent to Lucid regarding a potential acquisition.  (*Id.*)  Negotiations continued during the following weeks.  (*Id.*)

In addition to the Bloomberg article and related coverage, the overlapping leadership between Lucid and CCIV gave investors confidence that the acquisition would take place.  (*Id.* at ¶ 81.)  For example, the chairman of Lucid's board of directors was an operating partner of an entity that served as the sponsor of CCIV, and Klein was regarded as an important adviser to one of Lucid's largest investors.  (*Id.*)

On January 19, 2021, an article noted that Lucid had posted new job positions that "'only a public company would need'" such as a "'SEC reporting manager.'"  (*Id.* at ¶ 84.)  On January 28, 2021, Lucid's official Twitter account responded to an unaffiliated individual's[4] tweet that stated "CCCIIIVVV" [sic] with "Reservations are open at Lucidmotors.com."  (*Id.* at ¶ 86.)  Though Lucid quickly deleted the tweet, Twitter users interpreted it as an endorsement of ongoing merger negotiations.  (*Id.*)

News articles referring to the acquisition as imminent and as a great investment opportunity continued through the end of the month.  (*Id.* at ¶¶ 84-88.)

**The February 5 Misrepresentations**

On February 5, Rawlinson appeared on CNBC's *Squawk of The Street*, a show that provides coverage of the stock market.  (*Id.* at ¶ 89.)  During the interview he confirmed that Lucid expected to produce six to seven thousand units in 2021, and he stated that "we've already

---

[3] The RAC is vaguely worded, obscuring whether this agreement was signed with Lucid.

[4] The Court understands plaintiffs use of the term "unaffiliated individual" to mean an individual not affiliated with either CCIV or Lucid.

built our first phase of our factory in Arizona, which is good for 34,000 units." (*Id.* at ¶¶ 93-94.) He went on to say that the factory was "already built." (*Id.* at ¶ 94.)  Before Rawlinson made these statements, a graphic appeared on the screen that indicated the Arizona factory was built and fully commissioned and had a capacity of 34,000 units.  (*Id.* at ¶ 95.)  The impact Rawlinson's statements would have on CCIV was heavily covered in the media.  (*Id.* at ¶¶ 98-100.)  The day of the interview, CCIV's stock price increased 12.13%.  (*Id.* at ¶ 99.)

**The February 12 Misrepresentations**

On February 12, 2021, CNBC published an article with a video of Rawlinson standing in front of what he said was the Arizona factory and stating, "[h]ere we are in North America's first purpose-built EV factory, and right behind me we're doing the pre-production run – the release candidates for Lucid Air Dream Edition, which we're launching this year, this spring." (*Id.* at ¶ 101.)  That day CCIV's closing price was 26.92% higher than the prior day's closing price.  (*Id.* at ¶ 102.)

Contrary to Rawlinson's representations, the Lucid factory was not functional, the Air was not fully designed, Lucid had already moved its production start date from spring of 2021 to October 2021, and had abandoned its plans to produce 6,000 units in 2021.  (*Id.* at ¶ 103.)

**The Merger**

On February 22, 2021, at 6:29 p.m., Eastern Standard Time,[5] Lucid's official Twitter account posted an announcement that Lucid and CCIV had entered into a definitive merger agreement, whereby CCIV would acquire Lucid, effectively taking the company public, and linking to a press release.  (*Id.* at ¶ 141.)  Concurrently with the close of the merger, CCIV would sell approximately 166.6 million additional shares of CCIV stock at a price of $15.00 per share, raising an additional $2.5 billion of capital for the post-merger business. This additional stock sale is referred to as the "PIPE Investment," which refers to "private investment in public equity," because these newly issued shares were privately placed with sophisticated investors, rather than

---

[5] The RAC did not specify the time zone.  The Court confirmed the time zone by looking at the tweet, which was incorporated by reference.  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

1   sold publicly.  (*Id.* at ¶¶ 142-144.)

2       Once the merger was approved, a subsidiary of CCIV, Air Merger Sub., Inc., merged with

3   Lucid, with Lucid becoming the surviving entity of that merger.  (*Id.* at ¶ 142.)[6]

4       After the merger was official and trading closed, Lucid issued a press release that

5   referenced an Investor Presentation that Lucid made available on its website and filed with the

6   Securities and Exchange Commission ("SEC").  (*Id.* at ¶ 147.)  The presentation contradicted

7   Rawlinson's previous statements.  The Lucid disclosures noted that Lucid would be producing 577

8   Airs in 2021, not six to seven thousand; that the cars would be sold at the low-end of the potential

9   price range, resulting in a $380 million or 91% reduction in expected 2021 revenue; that the

10  factory was not yet built; and that production would not begin in spring 2021.  (*Id.* at ¶¶ 148-49.)

11  Rawlinson subsequently confirmed the presentation statements in media appearances and a call

12  with CCIV.  (*Id.* at ¶¶ 152-53.)  When asked why production dates had been pushed back,

13  Rawlinson said in one interview that the deal with CCIV had "'freed him'" from the need to work

14  to an "artificial" deadline.  (*Id.* at ¶ 154.)

15      In response to these revelations, CCIV's stock price fell.  The value decreased 36.63%

16  between closing on February 22 and February 24, CCIV's stock price fell 49.9%, resulting in a

17  decrease in $7.4 billion in market capitalization.  (*Id.* at ¶ 155.)

18      The plaintiffs in this action purchased CCIV common stock and call options between

19  February 5, 2021, the date of Rawlinson's appearance of *Squawk of The Street*, and February 22,

20  2021, the day the merger was announced ("the Class Period").  (*Id.* at ¶¶ 31-36.)  They allege that

21  defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b), promulgated

22  thereunder, causing plaintiffs to pay an inflated price for CCIV stock.

23  **II.   LEGAL STANDARD**

24      The standards under Federal Rule of Civil Procedure 12(b)(6) are well-known and not in

25  dispute.  To plead Section 10(b) claims, plaintiffs must also meet the requirements of Federal Rule

26  of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C.

27  § 78u-4(b).

28

United States District Court
Northern District of California

---

[6] After merging with Lucid, CCIV changed its name to Lucid Group Inc.  (*Id.* at ¶ 40.)

Rule 9(b) requires a plaintiff bringing a fraud claim to "state with particularity the circumstances constituting [such] fraud . . . ." Fed. R. Civ. P. 9(b). This "'requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citing Rule 9(b)).

Similarly, in pleading a cause of action for securities fraud under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b). The PSLRA also requires particularity in pleading the required state of mind and to "'plead with particularity both falsity and scienter.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009) (citation omitted); *see also Tellabs, Inc.*, 551 U.S. at 313; 15 U.S.C. § 78u-4(b)(1)-(2). The Ninth Circuit has dubbed the pleading requirements under the PSLRA "formidable" for a plaintiff seeking to state a proper claim and avoid dismissal. *Metzler Inv. GMBH*, 540 F.3d 1049, 1055 (9th Cir. 2008).

## III.  ANALYSIS

Plaintiffs root their claims in Section 10(b) which "imposes private civil liability on those who commit a manipulative or deceptive act in connection with the purchase or sale of securities." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 164 (1994). Section 10(b) and its enabling regulation, Rule 10b-5, do not contain an explicit right of action. However, courts have long acknowledged the existence of such a right. *Blue Chip Stamps v. Manor Drug Stores* ("*Blue Chip*"), 421 U.S. 723, 737 (1975) (stating the "private actions under Rule 10b-5" is a "judicial oak which has grown from little more than a legislative acorn").

Defendants argue that plaintiffs lack standing to bring Section 10(b) claims and have failed to adequately allege actionable misrepresentations, scienter, and materiality. The Court's analysis begins with standing, then moves to materiality. For the reasons set forth below, plaintiffs cannot satisfy the materiality hurdle, thus the Court declines to address whether the allegations contain actionable conduct or sufficiently allege scienter.

6

A.   **Standing**

Defendants argue that plaintiffs lack standing to bring Section 10(b) claims because their claims are based on "Defendants' statements about *Lucid*" not the company in which plaintiffs purchased stock, namely CCIV.  (Dkt. No. 113 at 9.)  They assert that to have Section 10(b) standing, plaintiffs must allege the defendant made misrepresentations about the security actually purchased or sold by the plaintiffs.  (Dkt. No. 113 at 10 (quoting *Blue Chip*, 421 U.S. at 747).) [7] Defendants assert four bases for their standing argument: (i) consistency with *Blue Chip*, (ii) precedence set by the Second Circuit, (iii) other supporting caselaw, and (iv) the need to construe the statute narrowly.  The Court addresses each in turn.

1.   ***Blue Chip***

Defendants first argue that dismissal is compelled by the 1975 Supreme Court decision in *Blue Chip*.  Defendants allege that *Blue Chip* held that to have Section 10(b) standing a plaintiff must allege the defendant made misrepresentations about the stock she purchased.  (Dkt. No. 113 at 9.)  Thus, defendants reason: plaintiffs allege defendants made misrepresentations about Lucid, not the company in which they purchased securities, CCIV.  Therefore, they lack standing under *Blue Chip*.

In *Blue Chip*, the plaintiff-appellee was offeree of the opportunity to buy stock in defendant trading stamp company.[8]  *Blue Chip*, 421 U.S. at 726-727.  Allegedly, defendants had convinced plaintiff and other offerees not to purchase Blue Chip stock by making overly pessimistic statements about Blue Chip in a prospectus.  *Id.*  The Supreme Court considered whether the plaintiff was able "to maintain a private cause of action for money damages where

_____

[7] In addition to challenging defendants' representation of standing requirements, plaintiffs maintain that the "in connection with" inquiry that is part of Section 10(b) analysis confers standing.  Plaintiffs provide no cases is support of this argument and rely on at least one case that contradicts it.  *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 961 (N.D. Cal. 2005) ("courts have not considered the 'in connection with' issue to be one of standing.  Rather, courts have construed the 'in connection with' requirement as an element of the plaintiff's prima facie case.").

[8] Under an antitrust consent decree, Blue Chip was required to offer a substantial number of common stock shares in its new trading stamp business to retailers like respondent which had previously used the stamp service but which were not shareholders in petitioner's corporate predecessor.

United States District Court
Northern District of California

1  they allege that the offeror has violated the provisions of Rule 10b-5 of the [SEC], but where they

2  have neither purchased nor sold any of the offered shares." *Id.* at 725.  The Court held that the

3  plaintiff did not have standing because he had not bought or sold a security.  Merely abstaining

4  from transacting in a security is inadequate to confer standing for a Section 10(b) claim.  This

5  limitation on standing has been referred to as the "purchaser-seller requirement" or the *Birnbaum*

6  rule, referring to a Second Circuit decision credited with first articulating this rule.

7       Because there is no statutory language from which the Court could discern the scope of

8  standing for this judicially created right of action, the *Blue Chip* Court reached its decision

9  primarily based on "policy considerations."  *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,

10  547 U.S. 71, 80 (2006) (describing *Blue Chip*).  Unbridled securities litigation could have

11  significant negative consequences including, frustration and delay of normal business activity, and

12  a general dampening of market participation, for fear of vexatious litigation.  *Blue Chip*, 421 U.S.

13  at 740-1.  A claim that a plaintiff *refrained* from buying or selling securities would rest almost

14  exclusively on oral testimony, which could not be assessed until trial, increasing the likelihood

15  defendants would have to defend themselves through trial.  *Id.* at 743.

16       Requiring that a plaintiff be a purchaser or seller created a concrete basis for liability, a

17  time-stamped transaction in a "demonstrable number of shares traded."  *Id.* at 734.  A purchaser or

18  seller could point to an action taken at a particular point in time and demonstrate a specific loss

19  based on the change in value of the amount of stock she had purchased or sold.  In contrast,

20  plaintiffs who abstained from participating in the market are likely to sue "for intangible economic

21  injury" that is "largely conjectural and speculative" and dependent on less concrete forms of proof,

22  namely, oral testimony.  *Id.* at 734-35, 743.  The Court also found that "[t]he general adoption of

23  the rule by other federal courts in the twenty-five years since it was announced [in *Birnbaum*],"

24  supported adoption of the rule.  *Id.* at 755.  At the time *Blue Chip* was decided, "virtually all"

25  courts to consider the issue followed *Birnbaum*.  *Id.* at 731.  The Court additionally found that the

26  *Birnbaum* rule was consistent with securities statutes and legislative history.  *Id.* at 755.

27  Defendants have not identified, and this Court is unaware of, any subsequent Supreme Court or

28  Ninth Circuit cases further delimiting Section 10(b) standing.

United States District Court
Northern District of California

8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

The Court finds *Blue Chip*'s holding clear: to have Section 10(b) standing, one must be a purchaser or seller of securities.  The Court does not read *Blue Chip* to further require, as a standing requisite, that plaintiffs allege defendant made misrepresentations about the security plaintiffs purchased.  First, the facts in *Blue Chip* did not concern that issue.  The plaintiff in *Blue Chip* alleged that the defendant made misstatements about Blue Chip, the company in which he had the right to purchase stock but did not.  Nor did the Supreme Court even provide dicta on the topic.

Nonetheless, defendants identify two phrases from *Blue Chip* to argue their interpretation.  First, they assert that *Blue Chip* "limits the class of plaintiffs to those who have at least dealt in the security '*to which the prospectus, representation, or omission relates*.'" (Dkt. No. 113 at 10 (quoting *Blue Chip*, 421 U.S. at 747).)  In fact, the full sentence reads:

> The virtue of the *Birnbaum* rule, simply stated, *in this situation,* is that it limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates.

421 U.S. at 747 (emphasis supplied).  Defendants ignore the Supreme Court's qualifying language, ("this situation"), in limiting the decision to the case and facts before it.  *See also id.* at 727 ("The only portion of the litigation thus initiated which is before us is whether respondent may base its action on Rule 10b-5 of the [SEC] without having either bought or sold the securities described in the allegedly misleading prospectus.").  Additionally, a representation or omission can "relate" to more than one company, and the term is generally viewed quite broadly.  Defendants do not explain why the Court should interpret the term "relates" restrictively and as synonymous with "about."  Likewise, nothing in *Blue Chip* compels such an interpretation.

The second phrase upon which defendants rely is equally broad.  The Supreme Court confirmed that under the *Birnbaum* rule Section 10(b) standing was limited to "'purchasers or sellers of the *stock in question*." *Blue Chip*, 421 U.S. at 742 (emphasis supplied).  Without explaining why, defendants assume that "the stock in question" refers to the stock that is the subject of the alleged misrepresentation.  However, the phrase is equally likely to mean the stock

that is the subject of the plaintiff's claim.[9]

Further, while the Supreme Court has not addressed the standing issue presented here, it has had many opportunities to summarize its holding in *Blue Chip*.  When it does, it states that *Blue Chip* limited standing to purchasers and sellers of securities, nothing more.  *See, e.g., Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 588 (2001) (stating "this Court held in [*Blue Chip*] that the Act does not protect a person who did not actually buy securities, but who might have done so had the seller told the truth.").[10]  The Ninth Circuit's decisions do the same.[11]  As such, the Court does not read *Blue Chip* to limit standing beyond the purchaser-seller rule.

### 2.    Second Circuit Authority

Next, defendants urge this Court to adopt the approach of the Second Circuit, the only circuit court to address the standing issue at bar.  The Court therefore addresses the circuit's two key decisions: *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.* ("*Nortel*") and *Menora Mivtachip Insurance Ltd. et al. v. Frutarom Industries Ltd., et al.* ("*Menora*").

*Nortel* held that "[s]tockholders do not have standing to sue under Section 10(b) and Rule 10b–5 when the company whose stock they purchased is negatively impacted by the material

---

[9] Defendants' reading of this sentence as a statement of *Blue Chip*'s holding is further unconvincing as it refers to "stock" and not "securities."  Were we to take this as the holding of *Blue Chip*, we would have to find that Section 10(b) standing is limited to purchasers of *stock* specifically, an absurd result, as Section 10(b) applies to other kinds of securities.  Sections 78j and 78c (defining "security" to include notes, bonds, futures, and other securities other than stock").

[10] *See also Dabit*, 547 U.S. at 80 (stating that the issue in *Blue Chip* was "the Court had to decide whether to permit private parties to sue for any violation of Rule 10b–5 that caused them harm, or instead to limit the private remedy to plaintiffs who were themselves purchasers or sellers.").

[11] *See, e.g., Sec. Inv. Prot. Corp. v. Vigman*, 803 F.2d 1513, 1516–17 (9th Cir. 1986) ("In [*Blue Chip*] the Court adopted the *Birnbaum* rule, which requires a purchase or sale of a security for standing to sue on an implied cause of action under Section 10(b) of the Exchange Act and Rule 10b–5."); *Freeman Invs., L.P. v. Pac. Life Ins. Co.*, 704 F.3d 1110, 1117 (9th Cir. 2013) (stating *Blue Chip* "held that only purchasers and sellers of securities have standing to bring a private securities fraud action").

misstatement of another company, whose stock they do not purchase." *Nortel*, 369 F.3d 27, 34 (2d Cir. 2004).  Plaintiff-appellants had purchased stock in a company called JDS, which manufactured and supplied fiber optic cables.  (*Id.* at 29.)  JDS had been involved in a number of business transactions with Nortel and Nortel was JDS's largest customer.  *Id.*  Both companies were publicly traded.  *Id.*  The companies publicly announced that JDS would be transferring part of its business to Nortel in exchange for Nortel stock and a promise to increase fiber optic component purchases.  *Id.*  Around the same time, Nortel publicly indicated that it saw strong demand for its fiber optic products and expected 30% growth in revenue earnings for the year.  *Id.*  These projections led JDS to make optimistic projections for its own business and JDS stock prices went up.  *Id.*  Plaintiffs purchased JDS stock.  Then, Nortel announced that it was cutting revenue estimates and halved its growth projections.  *Id.*  Nortel and JDS stock plummeted.  Plaintiffs who owned JDS stock brought Section 10(b) claims against Nortel.  The Second Circuit held plaintiffs who had purchased JDS stock did not have standing against Nortel.

      *Nortel* did not find *Blue Chip* dispositive.  Rather, it found *Blue Chip*'s reasoning "valuable in analyzing [the *Nortel*] plaintiffs' claims."  *Id.* at 32.  In *Blue Chip*, the Supreme Court explained that allowing plaintiffs standing based on *in*action would open the courts to abusive litigation based only on oral testimony.  The *Nortel* court reasoned that because "oral testimony would play a crucial role in proving that plaintiffs relied on Nortel's financial projections" as it related to their loses with respect to JDS stock, their standing would lead to the same risk of abusive litigation seen in *Blue Chip*.  *Id.* at 32-33.  This Court disagrees.

      *Blue Chip* focused on the unique problem that arises when a plaintiff's claim is based on *in*action and when it is likely that oral testimony will be the primary, or only, evidence.  That problem does not exist here or in *Nortel*.  The transactions of plaintiffs in both cases are anchored by the time of the transactions and the amount and value of securities bought or sold.  *Blue Chip*, 421 US at 742 ("The fact of purchase of stock and the fact of sale of stock are generally matters which are verifiable by documentation and do not depend upon oral recollection.").  *Nortel* does not change this Court's reading of *Blue Chip* and its relevance here.

Recently, the Second Circuit decided *Menora*, another case in which plaintiffs sought standing based on misstatements a company had made about itself where plaintiffs had not purchased securities in that company. *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 84 (2d Cir. 2022). Though *Menora* came out after briefing on this motion was complete, given defendants argument that this Court should be guided by the approach of the Second Circuit and the paucity of other relevant authority, the Court addresses it.

The reasoning in *Menora* is less compelling than that in *Nortel*. First, unlike *Nortel*, *Menora* asserts that *Blue Chip* requires that a plaintiff "have bought or sold the security about which a misstatement was made in order to have standing to sue under Section 10(b)." *Id.* at 86. The court provides little analysis to support this assertion but cites to the same two statements in *Blue Chip* upon which defendants rely. *Id.* at 85. As addressed, this Court reads those statements differently. [12]

Additionally, *Menora* appears to require that plaintiffs plead a misstatement to have Section 10(b) standing. *Id.* at 85 ("stating *Blue Chip* and *Birnbaum* "limited the class of plaintiffs who could sue under Rule 10b-5 to those who purchased or sold the securities about which a material *misstatement* was made") (emphasis supplied); *id.* at 86 ("The purchaser-seller rule requires plaintiffs to have bought or sold the security about which a *misstatement* was made in order to have standing to sue under Section 10(b).") (emphasis supplied). This conflicts with the Supreme Court's scheme-liability precedent, which allows for Rule 10-b(a) and (c) claims, in the absence of a misstatement. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158

---

[12] *Menora* also implies that its holding is compelled by *Birnbaum*. The Second Circuit's reading of *Birnbaum* has the same flaws as its reading of *Blue Chip*. *Birnbaum* also did not involve a plaintiff alleging defendant made misrepresentations about a company plaintiff did not deal in, nor does it address such a scenario in dicta. When the Supreme Court and Ninth Circuit have had occasion to describe *Birnbaum*'s holding, they do not mention an "about which" requirement. *Dabit*, 547 U.S. at 80 (stating "literally hundreds of lower court decisions had accepted '*Birnbaum*'s conclusion that the plaintiff class for purposes of § 10(b) and Rule 10b–5 private damage actions is limited to purchasers and sellers'") (quoting *Blue Chip Stamps*, 421 U.S. at 731–732); *Rochelle v. Marine Midland Grace Tr. Co. of New York*, 535 F.2d 523, 528 (9th Cir. 1976) (describing the *Birnbaum* Rule as "limiting standing under Section 10(b) and Rule 10b-5 to one who is a purchaser or a seller of securities").

United States District Court
Northern District of California

1    (2008) ("If this conclusion were read to suggest there must be a specific oral or written statement

2    before there could be liability under § 10(b) or Rule 10b–5, it would be erroneous.").  The Second

3    Circuit does not explain how its holding is consistent with scheme-liability precedent.  Thus, the

4    Court is not inclined to adopt the Second Circuit's approach.

### 3.    Other Case Law

6        Next, defendants claim widespread acceptance of its approach to standing.  As stated, the

7    Second Circuit is the only circuit court to directly address the standing issue at hand.[13]  While as

8    of issuance of this order, no court outside that circuit has cited *Menora*, several have relied on and

9    applied *Nortel*.  Having reviewed these cases, the Court does not see broad consensus on how to

10   limit Section 10(b) standing beyond the purchaser-seller requirement.

11       Based on this Court's survey, *Nortel*'s holding regarding standing has been considered in

12   seven decisions outside of the Second Circuit.  All but one of these decisions apply *Nortel* with

13   little or no commentary on the Second Circuit's reasoning.[14]  The one case to address *Nortel*'s

14   standing analysis (notably, the one court in the Ninth Circuit that has considered *Nortel*) concludes

15   that the "Second Circuit's rationale in that decision is problematic" and not supported by extensive

16   reasoning."  *Zelman*, 376 F. Supp. 2d at 962.

17       Further, at least two of these decisions are no longer in line with the Second Circuit's

18   approach after *Menora*.  *Nortel* had suggested in dicta that if two companies had a "direct

19   relationship" such as that created during a merger, that plaintiffs who purchased one company may

20

21       [13] As noted by plaintiffs, in *Semerenko v. Cendant Corp.*, 223 F.3d 165, 169 (3d Cir.
22   2000), the Third Circuit allowed plaintiffs who bought stock in a company that received a tender
     offer to bring Section 10(b) claims against the offeror company for representations the offeror
     made about itself, however, the question of standing was not raised or addressed.
23

24       [14] *Zaller v. Fred's, Inc.*, 560 F. Supp. 3d 1146, 1175-77 (W.D. Tenn. 2021); *Klein v. Altria
     Grp., Inc.*, 525 F. Supp. 3d 638, 657-58 (E.D. Va. 2021), *reconsideration denied*, No. 3:20CV75
25   (DJN), 2021 WL 2349904 (E.D. Va. Apr. 13, 2021); *Duane & Virginia Lanier Tr. v. SandRidge
     Mississippian Tr. I*, 361 F. Supp. 3d 1162, 1167-1171 (W.D. Okla. 2019); *In re: Altisource
26   Portfolio Sols., S.A. Sec. Litig.*, No. 14-81156 CIV-WPD, 2015 WL 12001262, at *3-4 (S.D. Fla.
     Sept. 4, 2015); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 902 n. 23 (E.D. Tenn.
27   2005) (declining to address standing because not properly raised); *In re Royal Ahold N.V. Sec. &
     ERISA Litig.*, 351 F. Supp. 2d 334, 380 (D. Md. 2004).
28

United States District Court
Northern District of California

1   have standing to sue based on misrepresentations of the other party to the merger. *Nortel*, 369

2   F.3d at 34. *Menora* held that there is no such exception. *Menora*, 54 F.4th at 88-89. Two cases

3   outside of the Second Circuit had found plaintiffs had standing under the "direct relationship"

4   exception. It is unclear if, faced with the issue again, these courts would follow the Second

5   Circuit's current approach. *Zelman*, 376 F. Supp. 2d at 962; *Klein*, 525 F. Supp. 3d at 658

6   (holding that JUUL sufficiently related to Altria to be sued by Altria stockholders for statements

7   JUUL made about JUUL).

8        Thus, while the Court can appreciate the simplicity of the *Nortel* and *Menora* rule

9   regarding standing, it finds it inconsistent with Supreme Court precedent and the policy

10  considerations with respect to standing, including the need to ensure confidence in the markets.

### 4. Section 10(b)'s Narrow Construction

12        Finally, defendants contend that this Court should apply their standing analysis because

13  Section 10(b) standing is to be construed "narrowly." *See, e.g., In Janus Cap. Grp., Inc. v. First*

14  *Derivative Traders*, 564 U.S. 135 (2011) (explaining holding limiting who can be liable for

15  making a misrepresentation for purposes of 10(b) liability "accords with the narrow scope that

16  must be given the implied private right of action"); *Stoneridge*, 552 U.S. at 167 (referring to "the

17  narrow dimensions we must give to a right of action Congress did not authorize when it first

18  enacted the statute and did not expand when it revisited the law"). *Menora* likewise cites the need

19  to construe Section 10(b) narrowly as a reason for its holding. *Menora*, 54 F.4th at 86.

20        Narrow interpretation does not mean that any suggested limitation on the right of action

21  should be adopted. The Supreme Court has narrowed the Section 10(b) right of action, but it has

22  also rejected proposed limitations. For example, in *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32

23  (1988), the Supreme Court rejected a rule applied in the Third Circuit requiring that there be an

24  "agreement-in-principle" before merger discussions can be considered material, in favor of a

25  broader rule. *Basic* also established a "presumption of reliance" under which "where materially

26  misleading statements have been disseminated into an impersonal, well-developed market for

27  securities, the reliance of individual plaintiffs on the integrity of the market price may be

28  presumed." *Id.* at 247. That presumption effectively *broadened* the right of action, initially

United States District Court
Northern District of California

14

1   relieving plaintiffs from individualized proof as to an element of the claim.

2       The Court also sees no benefit from limiting standing as defendants suggest.  The goal of

3   such a limitation appears to be to ensure Section 10(b) actions are only brought where a

4   defendant's conduct is meaningfully related to the plaintiff's harm.  This is already accomplished

5   by the elements of Section 10(b) claims, which include that a misrepresentation must be material

6   and made "in connection with" the purchase or sale of a security.

7       Not only would defendants' standing rule be redundant, it would conflict with Section

8   10(b) materiality analysis, under which a misrepresentation is material and actionable where "a

9   reasonable investor's decision would conceivably have been affected" by it.  *Retail Wholesale &*

10  *Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1277 (9th Cir.

11  2017).  This nuanced, and context-driven understanding of materiality, is necessary to accomplish

12  the purpose of Section 10(b), which is to safeguard and ensure public confidence in the market.

13  *Dabit*, 547 U.S. at 78 ("The magnitude of the federal interest in protecting the integrity and

14  efficient operation of the market for nationally traded securities cannot be overstated.").  Section

15  10(b) is not to be interpreted ". . . technically and restrictively, but flexibly to effectuate its

16  remedial purposes."  *S.E.C. v. Zandford*, 535 U.S. 813, 819 (cleaned up).

17      To conclude, Section 10(b) and Rule 10b-5 prohibit deceptive practices in connection with

18  the purchase or sale of any security.  Under Rule 10b-5, only a purchaser or seller of securities

19  may bring a suit for damages.  *Blue Chip*, U.S. at 755.  Thus, the purchaser-seller rule excludes

20  both "shareholders . . . who allege that they decided not to sell their shares because of . . . a failure

21  to disclose unfavorable material (and) . . . shareholders . . . who suffered loss in the value of their

22  investment due to corporate or insider activities . . . which violate Rule10b-5."  *Shivers v. Amerco*,

23  670 F.2d 826, 829 (9th Cir. 1982) (*citing Blue Chip*, 421 U.S. at 737 – 738).  Here, plaintiffs

24  purchased securities in CCIV and seek to hold Lucid and its CEO Rawlinson liable for inducing

25  them to make those purchases through misrepresentations and omissions about the value of Lucid

26  itself which CCIV then acquired.  Thus, plaintiffs purchased securities, have identified specific

27  alleged misconduct, and the alleged loss is discernible.  The Court finds plaintiffs have standing.

28      *// //*

United States District Court
Northern District of California

United States District Court
Northern District of California

1

**B.      Materiality**

2      Defendants argue that the RAC does not plead facts showing that statements and conduct

3   related to Lucid's business would be material to any reasonable purchaser of CCIV stock "at a

4   time when no merger between the companies had been announced and, indeed, when it remained

5   unconfirmed that the parties were even engaged in discussions."  (Dkt. No. 113 at 24.)

6      The Court notes that plaintiffs' opposition does not directly respond to this argument or

7   acknowledge that materiality is an element of Section 10(b) claims.  Rather, plaintiffs discuss

8   materiality in the context of standing[15] and argue that materiality is a question of fact

9   inappropriate for resolution at this stage noting "contemporaneous news articles and price

10   reactions [] show that investors viewed the statements as significant to investment in CCIV."

11   (Dkt. No. 132 at 5.)

12      The context of this case is significant to the analysis.  Generally, information is material

13   under Section 10(b) where there is a "'substantial likelihood' that the information at issue would

14   have been viewed by the reasonable investor as having significantly altered the total mix of

15   information made available for the purpose of decisionmaking [sic] by stockholders concerning

16   their investments." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 704 (9th Cir. 2021), *cert. denied*

17   *sub nom., Alphabet Inc. v. Rhode Island*, 212 L.Ed.2d 233 (2022) (cleaned up).  When assessing if

18   information related to a potential merger is material, the fact finder must balance the "likelihood"

19   or certainty the transaction will occur and the "magnitude" of the transaction. *Basic*, 485 U.S. at

20   232, 239 (1988).  Evidence of certainty usually takes the form of "indicia of interest in the

21   transaction at the highest corporate levels," such as "board resolutions, instructions to investment

22   bankers, and actual negotiations between principals or their intermediaries." *Id.* at 239.  The Ninth

23   Circuit has suggested other indicia including "whether the information comes from an insider or

24   some other source, [citation] [and] whether information concerning a potential acquisition is

25   unaccompanied by specific quantification or otherwise implied certainty." *S.E.C. v. Talbot*, 530

26

27      [15] The Court has taken those arguments into consideration here. *See* footnote 6, addressing

28   how plaintiffs tried to argue that the "in connection with" analysis as part of standing rather than
    materiality.

1   F.3d 1085, 1097–98 (9th Cir. 2008) (cleaned up).

2          While there is no bright line rule for how much certainty is required to render a potential

3   event material, circuit courts to address the issue have found that "merger discussions are

4   generally not material in the absence of a serious commitment to consummate the transaction."

5   *Employees' Ret. Sys. of Rhode Island v. Williams Companies, Inc.*, 889 F.3d 1153, 1168 (10th Cir.

6   2018); *see also Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 415 (1st Cir. 1989).  This Court

7   agrees.

8          Here, the RAC fails to allege that the merger was likely to take place when Rawlinson

9   made the alleged statements or when plaintiffs purchased CCIV stock and does not include facts

10  that could support such an allegation.  There were no statements or other public information from

11  "the highest corporate level" of Lucid or CCIV.  When plaintiff's purchased CCIV stock, neither

12  company had acknowledged they were in discussions, let alone indicated that a merger was likely.

13         The closest either company came to addressing a merger were Klein's statement that he

14  could not comment on whether the companies were communicating and Lucid's quickly deleted

15  tweet that mentioned CCIV.  "'[N]o comment'" statements are "generally the functional

16  equivalent of silence" and are not actionable misrepresentations under Section 10(b).  *Basic*, 485

17  U.S. at 239 n. 17.  Even if Klein's non-statement could be considered an indication that the

18  companies were in discussions about a merger, it says little, if anything, about the likelihood of the

19  merger.  Similarly, even if Lucid's quickly deleted tweet could be understood as an indication by

20  Lucid that the companies were discussing a merger, the statement does not indicate that the merger

21  is likely to occur.

22          Alleged news articles about a possible merger and the changes in CCIV's stock price in

23  response to Rawlinson's media appearances also are not reasonable indicators that the merger was

24  likely to take place.  The alleged articles were not based on confirmed statements from either

25  company.  They were speculative.  Indeed, plaintiffs allege that the initial Bloomberg article

26  announcing discussions between CCIV and Lucid was *false* and that the parties began discussions

27  *after* the article was published.  Changes in the stock price prior to February 22 are indicative of

28  the public's perception of the likelihood of the merger, not its actual likelihood.  The latter is what

17

United States District Court
Northern District of California

1  matters under *Basic*.

2      Section 10(b) claims should be dismissed based on materiality only where it is "obvious

3  that reasonable minds could not differ" in finding the information insignificant.  *In re Alphabet*, 1

4  F.4th at 699.  The Court finds this standard met here.  To show information regarding a potential

5  merger is material plaintiffs must be able to allege that the merger was likely to occur at the time

6  they relied on defendants' misrepresentations.  The Court cannot conceive of how plaintiffs could

7  reasonably think a merger was likely when Lucid and CCIV had not even publicly acknowledged

8  that a merger was being considered.   Accordingly, plaintiffs have failed to allege material

9  statements and defendants' motion to dismiss is **GRANTED.**

10     The Court recognizes that defendants' motion did not explicitly raise the standard set in

11 *Basic* for assessing materiality in the context of a potential merger.  Therefore, if plaintiffs have

12 additional facts which can be alleged which would meet this standard, plaintiffs may make a

13 motion to amend the pleadings and attach a proposed amended complaint showing the proposed

14 allegations (with a redline submitted to the Court and defendants).

15 **IV.    CONCLUSION**

16     For the reasons set forth above, the motion to dismiss is denied on grounds of standing and

17 granted on grounds of lack of materiality.  Plaintiffs may file a motion to amend by January 30,

18 2023.  If plaintiffs fail to do so, judgment shall be entered and the case closed.  Plaintiffs may also

19 file a notice if they do not intend to amend, in which case, judgment shall be entered and plaintiffs

20 may appeal.

21     This order terminates Docket Number 113.

22         **IT IS SO ORDERED.**

23     Dated: January 18, 2023

24                                                    _____
                                                      **YVONNE GONZALEZ ROGERS**
25                                                    **UNITED STATES DISTRICT JUDGE**

26

27

28